UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————

UNITED STATES OF AMERICA,

vs.

ALI JAAFAR, MOHAMED JAAFAR,
and YOUSEF JAAFAR,
                            Defendants.

—————————————————————

)
)
)
)
)       Docket No. 1: 21-cr-10248-NMG
)
)
)
)
)

**MOTION TO DISMISS INDICTMENT**
**[With Incorporated Memorandum of Points and Authorities]**

The most important and meaningful question in this case, the answer to which explicates and establishes the reason and purpose for all other actions that are the foundation for this prosecution but, the simplest and least understood circumstance that seems to confound the participants on both sides of the "v." was recognized and its importance captured and cogently expressed in a simple question by a woman juror during a grand jury presentation in a companion case,  At the end of the presentation the Prosecutor asked if the jurors had any questions.  The juror rose and asked -- "If I purchase a ticket and its mine and I choose to sell it, why is it illegal?" The least understood portion of this conundrum was patiently exposed when, at the request of the Prosecutor, the Trooper answered:

> If you win a ticket yourself and you give it to another person, sell it to another person, you're not allowed to do that. The only way you're allowed to do that is if you use what is described as Competent Court of Jurisdiction.

As will be shown *infra*, virtually every member of the prosecution team similarly confused the idea of an assignment of proceeds with the meaning of an owner. Without the resolution of this question all the statements in the Indictment are inexplicable.

**1**

I.     **THE INDICTMENT FAILS TO STATE AN OFFENSE BECAUSE THE SPECIFIC STATEMENTS SET OUT AS THE CHARGING LANGUAGE ARE QUESTIONS OF LAW NOT QUESTIONS OF FACT AND ARE NOT SUFFICIENT AS ALLEGATIONS THAT CAN BE CONSIDERED WITHOUT RESOLUTION OF THE QUESTIONS OF LAW REFERENCED IN THE CHARGING DOCUMENT.**

### a.   *Relevant Background of Laws, Prior Proceedings, and Acts of the Defendants*

The captioned criminal prosecution of Ali, Mohamed and Yousef Jaafar, a father and his two sons (hereinafter the "*Jaafars*") is part of a coordinated investigations involving multiple law enforcement agencies of the state and federal government. The target of the investigation is a so-called scheme aimed principally at the Commonwealth of Massachusetts, through the Massachusetts Lottery Commission (Lottery) for retail purchases of winning game tickets to evade and defeat the payment of taxes and other financial obligations possibly payable to the Commonwealth and the IRS.  The claimed activity is referred to as "*ten-precenting*". The primary focus of the investigation is the claimed manipulation of the Lottery's Rules and Regulations. The investigation began before 2018 and expanded thereafter and spread to various law enforcement agencies by criminal referrals from the Massachusetts State Lottery Commission to the federal and state prosecutorial authorities.[1]

### b.   *The Enactment of the Massachusetts Lottery Commission*

The Lottery was enacted in 1971 and has operated continuously for 51 years under the same basic enabling statute, *Massachusetts General Laws* c. 10, §20, *et seq*. and 961 CMR 2.0. The pertinent portions of the statute and Rules upon which the Indictment is predicated relate to the redemption procedure to receive payment for winning tickets – how the process physically operates and to whom payment will be made.  See and compare G.L. c. 10, §§24, 25, 28, and 29.

---

[1]  Two other prongs of the investigation are *Commonwealth v. Voelker*, Suffolk Superior Court, Docket No. 21SUCR00646-001, et al., presently pending in Suffolk County and *United States v. Jones* brought in this Court.  There are others that are still in the investigation stage.

Copies attached as *Addendum* 1.  Other than a Directive issued by the Lottery's Executive Director in 2018 there have been only minor amendments to the redemption paradigm in the past 50 years.

The particular provision that appeared troublesome to the Commonwealth and the Lottery relates to determining ownership of a winning ticket and how the legal interpretation of the concept interfaces with the other Rules to determine the identity of the person to whom the winnings would be paid – by the enactment, the winnings would be paid only to the owner and the owner was defined as the person *holding* an unsigned winnings ticket. See §§24 and 25.

The use of the *holder*/owner concept was considered as different from the provision in §28 that an assignee could not become an owner and the Lottery would not pay any of the proceeds from the winning ticket to an assignee. No similar restriction was placed on the *holder*/owner transactions. *Id*. Although the Lottery and other law enforcement agencies were aware of the *holder*/owner Rules and implications where the *holder* would invariably be a non-purchasing third-party in the redemption transactions counsel has been unable to find a single prosecution of a third-party *holder*/owner under §§24 and 25 before 2018.

### c.  The Paradigm Shifting 2018 Directive Implementing a New Rule Punishing "Frequent Lottery Winners"

In or about 2018, the Lottery, after having been criticized in a 1999 Audit performed by former Massachusetts State Auditor Joseph DeNucci for not changing the then existing redemption procedure, the Lottery did nothing and took no action on the audit results for over 14 years. The then existing process that the government now says is unlawful and illegal continued to be used by the Lottery.

In or about 2014, when the Lottery personnel were questioned again about the inactivity on changing third-party redemptions Mike Beaudet an investigative journalist from WCVB

interviewed Lottery Executive Director Michael Sweeney who indicated "he suspects high frequency winners are enabling fraud." See https://www.wcvb.com/article/5-investigates-lottery-targeting-high-frequency-winners/28511910 WCVBUpdated: 9:56 PM EDT Jul 25, 2019. Sweeney further stated that the Lottery believes "these winners very likely aren't just lucky; they're cashing the tickets that other people bought and getting cash or something else in exchange. It's an issue highlighted in state audit after state audit, this one going back 20 years." *Id*.

Beaudet pressed Sweeney by asking: "Why did it take the Lottery so long to go after this issue?" Sweeney indicated that the Lottery "is working with law enforcement to investigate high-frequency winners."  Sweeney concluded by theorizing that: "While the Lottery can't criminally charge players, it can under new regulations suspend them. *Id*.

The purpose of the new method in the Directive was not to amend the Lottery Laws but, rather, to exact some punishment in a different and peripheral area of the Lottery Laws and hope that would abate actions of so-called "frequent lottery winners".  The hope was that the imposition of a new rule making redemption more difficult would implicitly stop third parties obtaining and then redeeming winning lottery tickets from retail purchases. The Commission's actions were imposed beyond the authority delegated when the Lottery was enacted.

The apparent reason for this convoluted approach was that the Lottery had recently tried to obtain legislative approval through legislation proposed, drafted, and filed by the Executive Director, which never made it to the legislative body for a vote. The lack of legislative action reveals an indicium that the proposed change in the paradigm offered by the Lottery lacked legislative support and created a reasonable inference that the legislative intent was always to

link §24's permissible action for a third-party receiving possession of a winning ticket and become the owner and be able to redeem the prize.

Reclassifying the §24 transfer, with its attendant change of ownership and right to redeem the winning ticket, without directly and specifically amending the concept that the *holder* of an unsigned winning ticket becomes its owner and leaving in place the rule that only the owner was entitled to be paid the prize nullified the entire redemption procedure and left no procedure in place to obtain the bounty from the winning ticket.

II.     **THE PROSECUTION IN THIS CASE FAILED TO CONSIDER THE SECOND ASPECT REQUIRED IN THE EVALUATION OF THE PROPRIETY AND SUFFICIENCY OF THE INDICTMENT BY THE GRAND JURY**

At the previous hearing in this matter, counsel informed the Court that the foundation in both cases was an act of a non-purchasing third party obtaining possession of winning Lottery Tickets from a retail purchaser and thereafter presenting the ticket(s) for redemption of the proceeds from the Lottery. Because both prosecutions involve interpretations of the same state statute (MGL c. 10, (MGL c. 10, §20, *et seq*.) and were administered by the same state Administrative Agency, it might make sense to allow the Commonwealth to proceed and the instant case follow, after the same dismissal issues would have been raised and decided in the companion state cases.

Government counsel responded that the jurisdiction in each case involved a different sovereign, different statutes, and the constitutional issues in the state statute would not be dispositive of the different crimes charged in this Federal case. Simplifying his argument, the Prosecutor disputed the similarities between the two cases and stressed that the question in this case is whether the defendants received the income set out on their respective tax returns and whether the deductions claimed to offset the income were proper. The Prosecutor in the instand

case argued the narrower issue here could not be affected by a state court decision that the statute was vague and misleading.

The defendants replied that the propriety of various aspects of the statute and the agency's interpretation of unapproved changes to the Rules and Regulations and their misconstruing the breadth of its interpretation and application of the new Rules by the managerial staff at the Lottery skewed the meaning and understanding of the statute which, in turn, affected and obfuscated the meaning of the evidence presented and process of the presentation made to the Grand Jury. Defendants' counsel argued that the central issue in each prosecution is whether the establishment of the *Frequent Lotter Winners Rule* in 2018 implicitly nullified the applicability of the permissive procedure set out in G.L. c. 10, §§24 and 25 that allowed a third party to receive an unsigned winning ticket, become the *holder* and redeem the winnings.

Apparently believing the Jaafar's defense and request to dismiss is focused only on whether the enabling statute is unconstitutionally vague and overbroad, the government argues that a decision from the state court regarding that issue is irrelevant to the separately charged §371 conspiracy to commit tax fraud in the instant case. The Government expresses the simplicity of its position in a single connected series of questions – (1) did the Indictment allege that the Jaafars received income from the Lottery, (2) did they file and certify the identity of the income and, (3) did the Jaafars properly deduct purported gambling losses from the gross amount of the Lottery identified gambling winnings to avoid the amount of taxes owed, as compared to using the gambling loss deduction to defraud the United States.

The answer to this question is not a fact inquiry but, rather, is a question of law to decide if §29 relates to customers selling their winning tickets or only proscribes licensed agents. The

Jaafars submit that any decision from the state court will address the meaning of the operative charging concepts of holder, owner, winner, and assignment and how these concepts were understood by the Lottery Commission when it created and used this procedure for 50 years and how such inactivity could be viewed when the defendants filed their tax returns on income determined by the lottery and submitted on W-2G forms as gambling income.

The way the Lottery Commission and its employees perceived the Jaafars' acts and reacted to the public in general and how the denoting of the funds redeemed as gambling income and how such income would (or should) be adjusted by gambling losses – or any costs or loses -- impacts the willfulness and knowledge states of mind required to prove the tax fraud charges.

The Jaafars' submit that such a decision by an appellate court involves a far more nuanced examination than the opinion of the Massachusetts State Trooper who provided the expert opinion that "they can't do that", without amplification, or how the Trooper and the entire cadre of people involved instructed, by their respective opinions, that the transaction between the Jaafars and the retail purchasers constituted a §28 prohibited and unlawful assignment after having identified that very same interaction as a transfer of ownership of the ticket was unwaveringly described and treated as permissible for over 50 years.

When the defendants last appeared before this Court and were asked if any motions remained outstanding Defendants' counsel stated that the Defendants expect to file a *Motion to Dismiss* and were awaiting the state court's decision in a companion case brought by the Commonwealth and also based on a criminal referral from the Massachusetts Lottery Commission, The Voelker case also charged those defendants with, among other alleged violations of the Lottery's Rules and Regulations, conspiracy to commit tax fraud of taxes due to the United States.

The fraudulent scheme alleged in both the State and Federal cases is virtually identical and other than the jurisdictional differences. involved the same identical laws, agency Rule and Regulations, and activity that constitutes the alleged illegal activity in this case.

### a.   *The Application of the Laws to The Construction of the Indictment*

The Government expresses the simplicity of its position in a single connected series of questions – (1) did the Indictment allege that the Jaafars received gambling income from the Lottery, (2) did the Jaafars file and certify the identity of the income and, (3) did the Jaafars properly deduct purported gambling losses from the gross amount the Lottery identified as gambling winnings to avoid the amount of taxes owed, as compared to using the gambling loss deduction to defraud the United States.

The answer to these questions does not require an inquiry into the facts but, rather, is a question of law to decide if §29 relates to customers selling their winning tickets or only proscribes licensed agents. The Jaafars submit that any decision from the state court will address the meaning of the operative charging concepts of holder, owner, winner, and assignment and how these concepts were understood by the Lottery Commission when it created and used this procedure during the 50 years of operation and how such inactivity could be viewed when the defendants filed their tax returns on income determined by the lottery and submitted to them on W-2G forms as gambling income.

The way the Lottery Commission and its employees perceived the Jaafars' acts and reacted to the public in general and how denoting of the funds redeemed as gambling income and how such income would (or should) be adjusted by gambling losses impacts the willfulness and knowledge required to prove the tax fraud charges.  The Jaafars' submit that such a decision by an appellate court involves a far more nuanced examination than the opinion of the

Massachusetts State Trooper who provided the expert opinion that "they can't do that", without amplification, or how the Trooper and the entire cadre of people involved instructed, by their respective opinions, that the transaction between the Jaafars and the retail purchasers constituted a §28 prohibited and unlawful assignment after having identified that very same interaction as a transfer of ownership of the ticket was unwaveringly described and treated as permissible for over 50 years.

### b.  *The Applicable Law for a Decision in this Case*

The fraudulent scheme alleged in both the State and Federal cases is virtually identical and other than the jurisdictional differences. involved the same identical laws, agency Rule and Regulations, and activity that constitutes the claimed illegal activity in this case.

There are two primary ways in which a defendant can proceed with a motion to dismiss an indictment for failure to sufficiently state an offense: first, a defendant may contend that an indictment is insufficient on the basis that it does not charge an essential element of the crime; or second, a defendant may claim that an indictment fails to state an offense on the basis that the specific facts alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation. *United States v. Willis*, 844 F.3d 155 (3d Cir. 2016), opinion corrected, 2016 WL 7635927 (3d Cir. 2016). See also *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002). The question before a court on a motion to dismiss is not whether the indictment alleges sufficient **facts** from which the jury could find that defendant violated a given statute, but whether the government conceivably could produce such evidence at trial. *United States v. Segal*, 299 F. Supp. 2d 840 (N.D. Ill. 2004).

District court may resolve a motion to dismiss in a criminal case when the infirmity in the indictment is a **matter of law** and none of the relevant facts are disputed.  See *Fed.Rules*

*Cr.Proc.Rule 12(b)*, see also *United States v. Al-Arian*, 308 F. Supp. 2d 1322 (M.D. Fla. 2004). A court faced with a motion to dismiss must ask, first, whether the indictment states an offense, and second, whether the indictment is sufficiently specific to provide notice and allow the defendant to plead double jeopardy in a subsequent case. *United States v. Kramer*, 499 F. Supp. 2d 300 (E.D. N.Y. 2007). The Court must review the indictment using a commonsense construction and examine the statutes at issue as applied **to the facts as alleged in the indictment**, to determines whether defendants' conduct, as charged, reflects a proper interpretation of criminal activity under the relevant criminal statute(s). *United States. v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008).

In *United States v. Del Valle-Fuentes*, 2015 WL 6866174 (D.P.R. 2015) the Court stated that a motion to dismiss based on a defense, objection, or request that could be determined without a trial was the appropriate procedural vehicle for defendant to seek dismissal of indictment. A defendant is entitled to dismissal of the indictment if he shows that the indictment's allegations, even if true, would not state an offense. *United States v. Whyte*, 229 F. Supp. 3d 484 (W.D. Va. 2017), appeal dismissed, 691 Fed. Appx. 108 (4th Cir. 2017).

On a pretrial motion to dismiss an indictment or information based on the failure to state an offense, in limited circumstances, in which the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts, a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt. *United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019).[2] In *United States v. Musso*, 914 F.3d 26 (1st Cir. 2019) the Court indicated that a a district court may consider a pretrial motion to dismiss an indictment where the government

---

[2]   Undersigned counsel represented the co-defendant Sullivan in the Brisette case and made this same suggestion to the prosecutor as the most efficient and fair way to dispose of this case.

does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts. An indictment is ripe for dismissal if the facts demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense. *United States v. Sidoo*, 471 F. Supp. 3d 369 (D. Mass. 2020). This is the contention the Jaafars make in this case.

The errors in the Grand Jury presentation flow directly from the imposition and interpretation of the new *Frequent Lotter Winners Rule* and, the Defendants assert denied them Due Process of Law and a fair and unbiased consideration of the return of the indictment. The error was vividly displayed during the grand jury presentation in Voelker.[3]  As discussed above, in response a preceptive question by a Juror capturing the central issue in this case.  A woman juror asked: "If I purchase a ticket and its mine and I choose to sell it, why is it illegal?"[4]  The Prosecutor turned to one of the investigating offices and asked him to answer briefly and explain *unlawful assignment* as in G.L. c.10, § 23 *et seq*. and if he could provide in a very limited way his understanding of the law. *Id*., (emphasis added).  The Trooper answered incorrectly. The Trooper's answer is clearly wrong and highlights the fact/law distinction.  As a primary matter whether the question concerned the question of ownership, that the Prosecutor identified as an unlawful assignment, and that could only be determined as a legal decision of the specific words. The same circumstance is involved in all the statements set out in the Indictment. See Chart of statements attached as *Addendum* 2. The only way the statements could be considered proof of a crime is after the legal question about what the words mean and signify are resolved.  All the

---

[3]  Although counsel cannot say with certainty that the same question was asked by the indicting Grand Jury in this case the Answer and Instruction given on this point is the Lottery's position and was assuredly present in this case in words or substance.

[4]   Although the Commonwealth is now claiming the subject transfer transaction is an assignment rather than a sale, the presentation to the Grand Jurors before the question was asked implied the transaction was a change of possession from the retail buyer to a third party.

representations in the Indictment suffer from the same infirmity and all undergo a legal inquiry before any possible use to show that a crime was committed.

III.   **THE JAAFARS WERE DENIED DUE PROCESS OF LAW BY THE RETURN OF THE INDICTMENT**

Due process is the legal requirement that the government must respect all legal rights that are owed to a person. Due process balances the power of law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law. The question in the instant case is whether "the Jaafars" were afforded due process of law in accordance with the Fifth Amendment to the United States Constitution to an unbiased and fair consideration of the evidence in the return of an Indictment. The *ex parte* nature of the proceedings completely cedes to the prosecutor what and how evidence will be presented and the prosecution theory on which the jury will be asked to indict.

The historic and treasured independence of the Grand Jury process has waned of late as the grand jury's tendency to indict has become more pronounced, some commentators claim that the modern grand jury has lost its independence. See Susan W. Brenner, *The Voice of the Community: A Case for Grand Jury Independence*, 3 Va. J. Soc. Pol'y & L. 67, 100 (1995) (noting that the grand jury's nullification power allows it to insert an "influential, accurate, and legitimate community voice" into the criminal process).

Against this criticism, the Supreme Court has steadfastly insisted that the grand jury remains as a shield against unfounded prosecutions. See *Williams*, 504 U.S. at 47, (the Grand jury "serv[es] as a kind of buffer or referee between the Government and the people"); *Mandujano*, 425 U.S. at 571, (plurality opinion) ("the grand jury continues to function as a barrier to reckless or unfounded charges"); *Wood*, 370 U.S. at 390 (describing the grand jury as a

**12**

"primary security to the innocent against hasty, malicious and oppressive persecution" as it stands "between the accuser and the accused ... to determine whether a charge is founded upon reason or ... dictated by an intimidating power by malice and personal ill will[ ]"); *Stirone v. United States*, 361 U.S. 212, 218 (1960); *Hale v. Henkel*, 201 U.S. 43, 61 (1906). See also *Branzburg v. Hayes*, 408 U.S. 665, 686–87, (1972) (recognizing the dual function of the grand jury "of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions.").

This counterbalancing power of Grand Jurors to nullifying an otherwise sufficient but inappropriate indictment can only function properly when the government's presentation correctly and fairly reflects the evidence, the meaning and purpose of the statutory law and, if necessary for a fair and just decision any exculpatory circumstances that will mitigate undue prejudice. To remain faithful to his duty as an officer of the Court and purveyor of justice the prosecutor must instruct the jurors fully on the law they must consider. The prosecutor must be vigilant and ready to remedy any misunderstandings, confusion, and ambiguities in the evidence and law presented.

The Government's failure to present any witness testimony to show the Jaafars' willfully and knowingly entered the charged conspiracy with felonious intent to aid unnamed and unidentified retail purchasers to evade the payment of taxes or other financial obligation each might have to the Commonwealth or the federal government. The Government masked this deficiency by attempting to raise an inference through a nonexpert lottery employee who opined that the number of tickets and amount of money won by the Jaafars was statistically and factually impossible to be accomplished. Failing to correct this misimpression allowed the possibility the Grand Jurors inferred that activity involving so many tickets and such a large amount of money

was criminal and created an inference they knew what they were doing was wrong and they were engaged in this activity willfully and knowingly.  See *United States v. Pastor*, 419 F.Supp. 1318 (S.D.N.Y.1975); *United States v. Estepa*, 471 F.2d 1132 (2nd Cir. 1972).

The question in the Ali Jaafar, Mohamed Jaafar, and Yousef Jaafar (collectively "the Jaafars") prosecution is different than the issues that were raised in the Volker matter, and questioned by the prosecutor in this case as irrelevant to the federal tax evasion case.  In Volker, the question was whether the Massachusetts enabling statute G.L. c. 10, §§ 20 et seq. properly delegated to the lottery commission the authority to alter the redemption process without legislative approval.  The Lottery Laws clearly state that "[t]his section does not relieve any agency from compliance with any law requiring that its regulations be approved by designated persons or bodies before they may become effective. G.L. c. 10, §24 requires "[t]he concurrence of the chairman and of not less than two other members of the commission shall be required for all official actions of the commission. A copy of the minutes of each meeting of the commission, including any rules and regulations adopted by the commission or any amendments thereof, shall be forthwith transmitted, by and under the certification of the secretary thereof, to the governor."

The contention in Voelker is that the redemption process which was enacted in 1971 used the intertwining of provisions in three sections of Massachusetts General Laws Chapter 10 to craft the mechanism to redeem the bounty from winning tickets.  See and compare G.L. c. 10, §§24, 25, and 28.  The argument in Voelker asserts that several different variations of  particular words or ideas constituted ambiguity in whether the redemption process was vague and could not be understood by prospective people playing and interfacing with the Lottery.

In the instant Jaafar Indictment the Prosecutor and the Court have asked whether and why the propriety or the lawfulness of the statute is relevant, because irrespective of whether or not it

is, the question remains whether income was received and the tax returns that were filed were not correct and false obviating payment of the correct amount of taxes owed and required to be paid. The Prosecutor and the Court appear to perceive the question in this case to be whether, irrespective of the ability to establish that the original enactment was improper for being vague, what difference would such a finding in Voelker make as to whether the Jaafars received income and didn't pay taxes.

The question in the case at bar moves the focus from the statute as enacted to whether the Rule was established properly, created within the Lottery's authority, and its effect on use and continued viability of §§24, 25, and 28. The application of the 2018 Directive regarding Frequent Lottery Winners implicitly changes the redemption process and converts all instances where an unsigned winning ticket passes from the initial retail purchaser to a third party who by such change becomes the Holder and owner of the ticket and the only individual to whom the Lottery will pay the winnings.  That is the issue raised herein.

The Directive as written and construed by the Lottery and its several coinvestigators vitiates the entire concept of a *Holder*/Owner being the only authorized redeemer and effectively amends the entire meaning of the Lottery Laws in relation to redemption. Thus, there is no existing procedure to identify the owner and who will be paid. The incongruity in the Directive as written is that the new provision does not appear to make any pronouncement that the acts of a third party buying and redeeming winning tickets from the retail purchasers are prohibited. This inference is inescapable because the Directive does not foreclose the acts themselves but only limits the number of redemptions that can be done in one year. "Lotteries are not law enforcement agencies. They view things through the cultural prism of people winning. And I think there was a reluctance to really do a deep dive on this issue," Sweeney told Beaudet during

their above referenced interview. This statement implies that the Lottery did not care or want to know whether the procedure was lawful or not. This ambivalence was palpable and clearly created the sense that what the ten-percenters were doing was not illegal or improper.  The reversal of the Lottery's attitude towards holder/owner rights under §§24 and 25 was equally obvious to the grand jurors and that this kind of behavior was despicable and needed to be stopped, by any means necessary,

The propriety of the Indictment returned depends on the nature of the presentation made to the Grand Jury.  What Instructions were provided by the Prosecutor and whether the alteration in the redemption process caused by the Directive were clearly explained to the Jurors. Due process is the legal requirement that the government must respect all legal rights that are owed to a person. Due process balances the power of law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law. The question in the instant case is whether "the Jaafars were afforded due process of law in accordance with the Fifth Amendment to the United States Constitution to receive an unbiased and fair consideration by Grand Jury in the decision to return an Indictment.

The historic and treasured independence of the Grand Jury process has waned of late as the grand jury's tendency to indict has become more pronounced, some commentators claim that the modern grand jury has lost its independence. See Susan W. Brenner, *The Voice of the Community: A Case for Grand Jury Independence*, 3 Va. J. Soc. Pol'y & L. 67, 100 (1995) (noting that the grand jury's nullification power allows it to insert an "influential, accurate, and legitimate community voice" into the criminal process).

16

Against this criticism, the Supreme Court remains steadfast that the grand jury continues as a shield against unfounded prosecutions. See *Stirone v. United States*, 361 U.S. 212, 218 (1960), its predecessors and progeny like *Hale v. Henkel*, 201 U.S. 43, 61 (1906) and *Branzburg v. Hayes*, 408 U.S. 665, 686–87 (1972), all recognizing the dual function of the grand jury "of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." The countervailing power of Grand Jurors to nullify an otherwise sufficient but inappropriate indictment can only function properly when the presentation correctly and fairly reflects the state of affairs and stays alert to remedy any misunderstandings, confusion, and ambiguities in the evidence and law presented.

While in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened. Almost a century ago in *Berger v. United States*, 295 U.S. 78 (1935) the Court ruled that the competing considerations of "prejudice" and "probative value" effect whether an indictment will be returned.

Although the proceedings are *ex parte* and not overseen by a judge, the prosecutor's discretion in presenting evidence to the Grand Jury is nevertheless bounded. A prosecutor in the presentation has an obligation to uphold the fairness, impartiality, and lack of bias of this important governmental body. The prosecutor need not be entirely "neutral and detached" but should not ignore her duty to refrain from utilizing improper methods calculated to produce a wrongful [Indictment].

**17**

## IV.    CONCLUSION

For all the reasons set forth herein the Jaafars asked that indictment be dismissed, or alternatively the Court order the Government to provide defendants the Grand Jury transcripts and give the Jaafars the opportunity to investigate the infirmities argued herein and supplement their *Motion to Dismiss*.

Respectfully submitted,
Ali Faafar, Mohamed Jaafar and Yousef Jaafar,
by their attorneys

*William Cintolo*

_____

William Cintolo, BBO No.084120
1 International Place, Suite 1820
Boston, MA 02110
617.439.7775
WCintolo@CEKLAW.net

*John F. Palmer*

_____

John F. "Jeff" Palmer
Law Office of John F. Palmer
18 Main Street Extension
Suite 201B
Plymouth, MA 02360
Cell #: 617-943-2602
Tel. #: 508-746-8129

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered parties on August 8, 2022.

/s/William Cintolo

**18**

# *ADDENDUM 1*

**Section 24.** The commission is hereby authorized to conduct a state lottery and shall determine the types of lottery or lotteries, to be conducted, the price, or prices, of tickets or shares in the lottery, the numbers and sizes of the prizes on the winning tickets or shares, the manner of selecting the winning tickets or shares, the manner of payment of prizes to the holders of winning tickets or shares, the frequency of the drawings or selections of winning tickets or shares and the type or types of locations at which tickets or shares may be sold, the method to be used in selling tickets or shares, the licensing of agents to sell tickets or shares; provided, however, that no tickets or shares, other than season tickets, so-called, shall be sold, offered for sale, or purchased from a licensed sales agent or the lottery commission by telephone or by the use of computer or facsimile services; provided, further, that said restriction shall not govern the transmittal of lottery information and sales through telephone services strictly between the lottery commission and its duly licensed sales agents; provided, further, that no person under the age of eighteen shall be licensed as an agent, the manner and amount of compensation, if any, to be paid licensed sales agents, and such other matters necessary or desirable for the efficient and economical operation and administration of the lottery and for the convenience of the purchasers of tickets or shares and the holders of winning tickets or shares; provided, however, that the amount of compensation, if any, to be paid to licensed sales agents as a commission pursuant to this section shall be calculated on the total face value of each ticket or share sold and not on any discounted price of any such ticket or share sold. The commission is authorized to operate the daily numbers game seven days a week. Each state lottery ticket or share shall have imprinted thereon the state seal and a serial number. The commission may establish, and from time to time revise, such rules and regulations as it deems necessary or desirable and shall file the same with the office of the state secretary. The commission shall advise and make recommendations to the director regarding the operation and administration of the lottery. The commission shall report monthly to the governor, the attorney general and the general court, the total lottery revenues, prize disbursements and other expenses for the preceding month, and shall make an annual independently audited financial report to the same which shall include a full

and complete statement of lottery revenues, prize disbursements and other expenses, including such recommendations as it may deem necessary or advisable, which shall be made available electronically to the general public not later than the earliest date established for reports in section 12 of chapter 7A. The commission shall report immediately to the governor and the general court any matters which require immediate changes in the laws of the commonwealth in order to prevent abuses and evasions of the lottery law or rules and regulations promulgated thereunder or to rectify undesirable conditions in connection with the administration or operation of the state lottery.

The commission is authorized to carry on a continuous study and investigation of said lottery throughout the commonwealth in order (1) to ascertain any defects in the state lottery law or in the rules and regulations issued thereunder whereby any abuse in the administration and operation of the lottery or any evasion of said law or said rules and regulations may arise or be practiced, (2) to formulate recommendations for changes in said law and the rules and regulations promulgated thereunder to prevent such abuses and evasions, and (3) to guard against the use of said law and rules and regulations issued thereunder as a cloak for the carrying on of organized gambling and crime.

The commission shall make a continuous study and investigation of the operation and administration of similar laws in other states or countries, of any literature on the subject which from time to time may be published or available, of any federal laws which may affect the operation of the lottery, and of the reaction of citizens of the commonwealth to existing and potential features of the lottery with a view to recommending or effecting changes that will tend to better serve and implement the purposes of the state lottery law.

The concurrence of the chairman and of not less than two other members of the commission shall be required for all official actions of the commission. A copy of the minutes of each meeting of the commission, including any rules and regulations adopted by the commission or any amendments thereof, shall be forthwith transmitted, by and under the certification of the secretary thereof, to the governor.

The commission shall have the power to issue subpoenas to compel the attendance of witnesses and the production of documents, papers, books, records and other evidence before it in any matter over which it has jurisdiction, control or supervision. The commission shall have the power to administer oaths and affirmations to persons whose testimony is required.

## Section 25: Apportionment of lottery revenues

Section 25. The apportionment of the total revenues accruing from the sale of lottery tickets or shares and from all other sources shall be as follows:—(a) the payment of prizes to the holders of winning tickets or shares which in any case shall be no less than forty-five per cent of the total revenues accruing from the sale of lottery tickets; (b) the payment of costs incurred in the operation and administration of the lottery, including the expenses of the commission and the costs resulting from any contract or contracts entered into for promotional, advertising or operational services or for the purchase or lease of lottery equipment and materials which in no case shall exceed fifteen per cent of the total revenues accruing from the sale of lottery tickets, subject to appropriation; and (c) the balance shall be used to fund budgeted aid to cities and towns as provided in section 18C of chapter 58, subject to appropriation.

# Section 28: Assignability of prizes; liability of commissioner and director

Section 28. The right of any person to a prize drawn is not assignable except under the following limited circumstances:

(1) Payment of any prize drawn may be paid to the estate of a deceased prize winner or to the IV–D agency under chapter 119A.

(2) Payment of any prize drawn may be made to any person under an appropriate judicial order.

(3) The commission may, by regulations adopted under section 24, permit assignment of prizes for purposes of paying estate and inheritance taxes, or to a trust the beneficiaries of which are the prize winner, his mother, father, children, grandchildren, brothers, sisters or spouse.

(4) Payment of any prize drawn may be made to a person under a voluntary assignment of the right to receive future prize payments, in whole or in part, if the assignment is made to a person or entity named as the assignee in an appropriate judicial order of a court of competent jurisdiction, which shall be the superior court sitting within and for the county in which the commission is situated or in which the assignor resides. Under this paragraph, a court may issue an order approving a voluntary assignment and directing the commission to make prize payments in whole or in part to the designated assignee, if the court finds that all of the following conditions have been met:

(A) the assignment is in writing, executed by the assignor and, by its terms, subject to the laws of the commonwealth;

(B) the court finds that the assignor:

(i) is of sound mind and not acting under duress,

(ii) has been advised regarding the assignment by his independent legal counsel and independent certified financial planner; for purposes of this clause, "independent" shall mean unrelated to, unassociated with, and not compensated by the assignee or the assignee's affiliates;

(iii) irrevocably agrees that he is subject to state income tax with respect to a gain or income which the assignor will recognize in connection with the transfer or assignment; and

(iv) understands and agrees that with regard to the assigned payments, the commonwealth, the commission, and the director shall have no further liability or responsibility to make said payments to the assignor.

(v) In making the findings under clauses (i), (ii), (iii), and (iv), absent a showing of special circumstances or hardship, the court shall require the personal appearance and in-court affirmation of the assignor. For purposes of this section, "special circumstances or hardship" shall mean the assignor resides outside of the commonwealth or a health or other condition makes a court appearance unduly costly, dangerous, or burdensome, in which case the court may, in its discretion, take evidence by way of telephonic testimony, video deposition, or written affidavit.

(C) at the time he executed the assignment contract, the assignor was provided with a written disclosure statement setting forth, in bold type of not less than 14 points, the payments being assigned, by amounts and payment dates; the purchase price being paid; the rate of discount to present value, assuming daily compounding and funding on the contract date; and the amount, if any, of closing, administrative or other fees or charges that will be charged to him; but, the disclosure statement shall be in a form approved by the commission.

(D) the assignor was advised in writing, at the time he signed the assignment contract, that he had the right to cancel the contract, without any further obligation, within 10 calendar days following the date the contract was executed, upon return of any payment received in consideration for the contract.

(E) the assignment contract shall provide that delinquent child support obligations of the assignor and debts owed to a state agency by the assignor, as of the date of the court order, shall be paid in full, at closing.

(F) if the court determines at the time of the hearing set forth in subparagraph (B) that the assignment is not in compliance then the court shall have discretion to void the assignment without recourse or obligation to the proposed assignor or assignee.

(5) In the case of a voluntary assignment for consideration made under a judicial order pursuant to paragraph (4), the assignee shall withhold 5.3 per cent of the purchase price and pay that withheld amount to the commonwealth as state income tax withholding to credit the account of the assignor, within 10 days of closing the assignment transaction.

(6) In the case of a voluntary assignment for consideration made under paragraph (4), delinquent child support obligations of the assignor and debts owed to a state agency by the assignor that are not paid in full, at closing of the assignment contract shall be offset by the commission first against remaining payments or portions thereof due the prize winner and then against payments due the assignee.

(7) The commonwealth, the commission, the director, and the agents and employees of the commission shall be discharged of all further liability upon payment of a prize in full to the parties identified in a court order entered under paragraph (4), less any amount offset under paragraph (6).

(8) Soliciting to buy or offering to sell rights to lottery prize winnings, either by assignment or through pledge as collateral for a loan, shall not be deemed selling or offering for sale lottery tickets or shares under this chapter.

(9) The director may establish a reasonable fee, payable by the assignee, to defray administrative expenses associated with assignments made under this section, including the cost to the commonwealth of a processing fee that may be imposed

by a private annuity provider. The fee amount shall reflect the direct and indirect costs to the commonwealth associated with processing the assignments and shall be no greater than $1,000 per transaction.

(10) Written notice of a proposed assignment under paragraph (4) and a court hearing concerning the proposed assignment shall be provided to the commission at least 10 days before a court hearing. The commission is not required to appear in or be named as a party to the action seeking judicial confirmation of an assignment under this section, but may intervene as of right in the proceeding. A certified copy of a court order approving a voluntary assignment shall be provided to the commission not later than 14 days before the date on which the payment is to be made.

(11) Nothing in this chapter shall exempt an assignee or person acting as broker, agent, or intermediary for an assignee, from the licensure requirement and other rules and restrictions imposed under section 96 of chapter 140.

(12) A court order obtained under paragraph (4), together with any other order issued in connection with any 1 prize drawn, shall not require the commission to divide payments among more than 3 different persons or entities.

(13) No business entity may seek or obtain an order approving a voluntary assignment of lottery prize payments under this section unless and until the business entity has first filed a written disclosure and registration statement with the state lottery and paid the registration fee specified in clause (iv) of this paragraph. The disclosure and registration statement shall list and disclose, under penalty of perjury under the laws of the commonwealth, the following:

(i) the registrant's name, mailing address, and telephone number;

(ii) the name and address of the registrant's agent for service of process in the commonwealth;

(iii) claims by a lottery winner, a state lottery, a consumer protection agency or a state, federal, or local prosecutor or enforcement agency against the registrant or its affiliates in a state or federal court within the past 5 years, and the status and disposition of the claims;

(iv) the registrant's privacy, "do-not-call" and non-harassment policies.

The registration and disclosure shall be accompanied by a non-refundable fee in the amount of $2,500 payable to the commission by the registrant. All registrations and disclosures shall be maintained on file with the commission and shall be made available to a member of the public upon request.

(14) An assignment in violation of this section shall be invalid. The commonwealth, the commission, the director, and the agents and employees of the commission shall not be liable to make payments pursuant to an invalid assignment.

(15) This section shall prevail over section 9–406 of chapter 106.

Section 28A: **Past-due child support; disbursement of prizes**

Section 28A. Prior to disbursement of a prize in excess of $600, the commission shall review information furnished by the IV–D agency and by the department of revenue, as set forth in chapter 119A and in this section to ascertain whether the holder of a winning ticket owes past due child support to the commonwealth or to an individual to whom the IV–D agency is providing services, and to ascertain whether the holder of a winning ticket owes any past-due tax liability to the commonwealth. If the holder owes past-due child support or a past-due tax liability, the commission shall notify the IV–D agency or the commonwealth, respectively, of the holder's name, address and social security number. Subsequent to statutory state and federal tax withholding, the commission shall first disburse to the IV–D agency the full amount of the prize or such portion of the prize that satisfies the holder's past-due child support obligation and, if funds remain available after that disbursement, the commission shall disburse to the department of revenue the full amount of the prize or such portion of the prize that satisfies the holder's past-due tax liability. The commission shall disburse to the holder only that portion of the prize, if any, remaining after the holder's past-due child support obligation and the holder's past-due tax liability have been satisfied.

Section 28B: **List of winning lottery ticket holders**; transmission to department of transitional assistance, executive office of health and human services and IV&ndash;D agency

Section 28B. The commission shall, on a monthly basis, transmit to the department of transitional assistance, the executive office of health and human services, the office of Medicaid and the IV–D agency, as set forth in chapter 119A, a list of all persons **who were the holders of a winning ticket in excess of $600** in the prior month. The information shall be provided in a format which is compatible with the automated data processing systems of the respective department, office or agency to ensure the immediate identification of persons who may be receiving public assistance benefits. The information provided shall include the name, address and social security number of the holder of the winning ticket and the face value of the winning ticket.

Section 29: **Prohibited sales; penalty**

Section 29. No person shall sell a ticket or share at a price greater than that fixed by the commission. No person other than a licensed lottery sales agent shall sell lottery tickets or shares, except that nothing in this section shall be construed to prevent any person from giving lottery tickets or shares to another as a gift.

No ticket or share shall be sold to any person under age eighteen, provided that a person eighteen years of age or older may purchase a ticket or share for the purpose of making a gift to a person under age eighteen.

Whoever violates any provision of this section shall be punished by a fine of not less than one hundred nor more than five hundred dollars.

961 CMR 2.03 – Definitions -- State Regulations

Current through Register 1466, April 1, 2022

Act or Law means M.G.L. c. 10, §§ 22 through 35 and § 36.

Administrative Bulletin means a set of rules or guidelines issued by the Director for the purpose of detailing the rules, procedures or specific details of games and/or drawings and other matters that may arise from time to time in the course of business.

Bank means and includes all banks, banking associations, cooperative banks, credit unions, trust companies and any other type or form of banking institution organized under the authority of the Commonwealth of Massachusetts or the United States of America whose principal place of business is within the Commonwealth of Massachusetts and is designated to perform such functions, activities, or service in connection with the operations of the Lottery for the deposit and handling of Lottery funds.

Claims Center, Claim Center or Office means any place designated by the Lottery where the holder or his or her representative may file a claim upon a paper form supplied by the Lottery for payment or acknowledgment of a Lottery prize and the submission of the winning ticket.

Commission means a board of five members consisting of the State Treasurer, Secretary of Public Safety or his or her designee, the State Comptroller, or his or her designee, and two persons appointed by the Governor with the powers and authority to conduct a state Lottery as conferred by law.

Director means the Director of the Massachusetts State Lottery. Any reference to powers and duties of the Director also means the Director's authorized designee.

Gift Certificate means a document printed in fixed dollar amount redeemable for Lottery products.

High-frequency Prize Winner means a person, as defined in 961 CMR 2.03, who submits at least 20 claims for Lottery prizes, each with a value of at least $1,000.00, within any period of 365 days.

Instant/Pull Tab Ticket means a Lottery ticket issued by the State Lottery.

Lottery or State Lottery means the Lottery established and operated pursuant to M.G.L. c. 10, §§ 22 through 35 and § 36.

Lottery Online and/or Digital Property means one or more websites, mobile applications, or other on-line and/or digital services established by the Lottery.

Mobile Claim means a claim submitted through a Lottery Online and/or Digital Property in accordance with the Mobile Claim Process.

Mobile Claim Process means the terms, conditions, and requirements set, by the Director in his or her discretion for the submission and processing of Mobile Claims, which shall require, at a minimum, the claimant to submit sufficient claim and winning ticket information as determined by the Director, and which includes, but is not limited to, the claimant to have a registered player account for Mobile Claims,

as defined by the Lottery to be valid, the claimant's digital signature, and the submission of barcode(s) for a valid ticket to be automatically verified against the Lottery's computer gaming system for eligibility.

On-line System means the Lottery's On-line Computer Wagering System consisting of ticket issuing terminals, central processing equipment and a communications network.

On-line Instant Ticket Cashing means a procedure by which sales agents are required, as a prerequisite to cashing, to validate instant tickets via an on-line bar code scanner.

On-line Ticket means a ticket produced on official paper stock in an authorized manner from the Lottery's on-line computer system.

Person means and includes any individual, association, corporation, club, trust, estate, society, company, joint stock company, receiver, trustee, designee, referee, executor, administrator, commissioner, charitable institution, fraternal organization, guardian, custodian, any legal entity created by law, all natural individuals in all capacities whether appointed by a court or otherwise and any other combination of individuals or legal entities. Person shall also be construed to mean and include all departments, commission, agencies, and instrumentalities of the Commonwealth of Massachusetts, including counties and municipalities, agencies, and instrumentalities thereof.

Prize means any award, financial or otherwise, awarded by the State Lottery.

Prize Winner means the individual who represents him or herself to be the winner of a single prize or one or more individuals who represent themselves as winners of a portion of a single prize as identified on Internal Revenue Service Form 5754 at the time the claim is filed and reported as such to the Internal Revenue Service and the Department of Revenue.

Promotions means limited time marketing initiatives to promote the Lottery and its products, which may include special offers.

Remote Ticket Cashing Service means a function provided by the Lottery through the Lottery Online and/or Digital Properties which is designated to allow users to file Mobile Claims of eligible Lottery tickets, and transfer awarded prize winnings to a bank account pursuant to the Mobile Claims Process.

Sales Agent means a person who has been licensed to sell Lottery tickets or register bets on behalf of the player under M.G.L. c. 10, §§ 22 through 36.

Trust Account means a designated dedicated bank account for the receipt of Lottery proceeds.

Quic Pic or Quick Pick means a player option in which number selections are determined at random by computer software.

Notes

961 CMR 2.03 -- Amended by Mass Register Issue 1292, eff. 7/31/2015. Amended by Mass Register Issue 1317, eff. 7/15/2016. Amended by Mass Register Issue 1376, eff. 7/27/2018. Amended by Mass Register

Issue 1400, eff. 6/28/2019. Amended by Mass Register Issue 1443, eff. 4/21/2021. Amended by Mass Register Issue 1447, eff. 4/21/2021.

961 CMR 2.27 - Price of Tickets - Limitations

Current through Register 1466, April 1, 2022

(1) No person may sell a ticket at a price other than that established in accordance with 961 CMR 2.00, unless so authorized in writing by the Director. The Lottery may, authorized by the Director in writing, permit the use of Lottery tickets for Lottery promotions, as defined by 961 CMR 2.03 at such price, if any, to be set by the Director, for a limited purpose, and which the rules of such promotion shall be approved in writing by the Director. No person other than a duly licensed Lottery Sales Agent may sell Lottery tickets, except that nothing in 961 CMR 2.27 shall be construed to prevent a person who may lawfully purchase tickets from making a gift of Lottery tickets to another. Nothing in 961 CMR 2.27 shall be construed to prohibit the Lottery from designating certain of its Sales Agents and employees to sell Lottery tickets directly to the public.

(2) Lottery tickets may be given by merchants as a means of promoting goods or services to customers or prospective customers contingent upon such persons purchase of some other article provided any monetary consideration paid for such article is at least four times the sales price of the ticket given.

(3) Lottery tickets may be given by merchants as a means of promoting goods or services to customers or prospective customers contingent upon such persons performing some minimum activity required by the merchant such as taking a test ride in a vehicle held for sale by the merchant, opening a new bank account, or the like.

(4) In no event may the gift of a Lottery ticket be used as an inducement to solicit the sale or lease of goods or the rendering of services which sale, lease or rendering is to be bound by a contract which is subject to M.G.L. c. 93, § 48.

(5) A Sales Agent shall not sell a ticket to any person younger than 18 years old, unless otherwise permitted by law, nor may he or she sell a ticket away from the locations listed in his or her license.

(6) No person may use or permit his or her ticket to be used in any drawing or in any other game of chance, however, it may be described, except for the purpose of the Lottery as defined in 961 CMR 2.03, except that tickets may be given as prizes in a raffle conducted pursuant to M.G.L. c. 271, § 7A, or, with the written permission of the Director, as prizes in commercial promotions when no additional monetary consideration is required for the opportunity to win a prize.

Notes

961 CMR 2.27 -- Amended by Mass Register Issue 1400, eff. 6/28/2019. Amended by Mass Register Issue 1443, eff. 4/21/2021. Amended by Mass Register Issue 1447, eff. 4/21/2021.

961 CMR 2.38 - **Procedure for Claiming Prizes**

Current through Register 1466, April 1, 2022

The following shall be the procedure by which prizes may be claimed and paid from the State Lottery:

(1) Place of Claims. All cash prizes must be claimed through a Sales Agent, a duly authorized Claims Center or Office, or at the sole discretion of the Director, through the Mobile Claim Process.

(2) To be eligible for a prize, the prize winner must submit an original winning ticket prior to the expiration of the claim period. At the sole discretion of the Director, a prize winner may be allowed to become eligible for a prize by submitting winning ticket information, in lieu of an original winning ticket, using the Mobile Claim Process prior to the expiration of the claim period. On-line tickets must be claimed within one year of the drawing date. Instant tickets must be claimed within one year of the end of the particular game. For prizes less than $600.00, a claim is valid only when the original winning ticket has been presented for payment and validated by the Lottery's computer gaming system at a sales agent, claim center, or Lottery office. For prizes of $600.00 or greater, but less than $100,000.01, a claim is valid only when the original winning ticket has been presented for payment, a claim form has been properly completed, and the ticket has been validated by the Lottery's computer gaming system and verified by Lottery internal validation requirements at a Lottery office or duly authorized claim center. For prizes of $100,000.01 or greater, a claim is valid only when the original winning ticket has been presented for payment, a claim form has been properly completed, and the ticket has been validated by the Lottery's computer gaming system and verified by Lottery internal validation requirements at the office of the Director. Notwithstanding any other provision in 961 CMR 2.00, the Lottery may allow some Lottery Online and/or Digital Property users to file Mobile Claims of eligible Lottery tickets, and transfer awarded prize winnings to a bank account pursuant to the Mobile Claim Process and such other terms and conditions as the Director may set or find desirable in his or her discretion. The Lottery may require certain claims for prizes of any amount be claimed at the office of the Director. Tickets or Mobile Claims submitted for payment subsequent to the claim period defined above are void. The Lottery may require certain claims for prizes of any amount be claimed at the office of the Director. Tickets or Mobile Claims submitted for payment subsequent to the claim period defined above are void.

(3) Claim Forms. Each prize ticket owner, other than those paid in cash, or his or her representative is required to complete the claim form which is available free of charge at each Sales Agent or Lottery office and sign the winning ticket. If the prize ticket owner is a minor or other person(s) unable to complete the claim form, then said minor or person shall have his or her guardian, conservator, parent, adult member of his or her household, or his or her next friend or other proper representative complete the claim form in his or her stead. If the Director determines that the person who completed the claim form in behalf of an owner is not the proper person to claim the prize in behalf of the owner, the Director may demand a new claim form completed by a person who is acceptable to the Director as the proper person so to claim the true owner's prize. The claim form incorporates by reference the following provisions:

(a) Verification that the prize ticket owner is not a person disqualified by law or by 961 CMR 2.00 to claim or otherwise accept a prize from the Lottery;

(b) The prize ticket owner grants to the Commission the right to use his or her name, address, and photograph to publicize his or her winnings. This same right is granted to the Commission by one signing in behalf of a minor or other ticket owner under a disability which prevents him or her from signing in his or her own behalf;

(c) Indemnification of the Commission for any loss occasioned by an untruth or misrepresentation by the ticket owner or the person claiming the prize in his or her behalf;

(d) All information requested by the Commission which may include, but not be limited to, the prize ticket owner's (and any person signing in his or her behalf) name, address, and social security number or taxpayer's identification number.

The claim form may contain any other provision which the Director may, from time to time, deem necessary and proper to protect the Commission and the public welfare. Each claim form must have attached thereto the original Lottery ticket.

Notwithstanding any of the foregoing, the Lottery may allow some users to submit a Mobile Claim using the Mobile Claim Process in lieu of submitting a claim form. Each Mobile Claim incorporates by reference the following provisions:

(e) Verification that the prize ticket owner is not a person disqualified by law or by 961 CMR 2.00 to claim or otherwise accept a prize from the Lottery;

(f) The prize ticket owner grants to the Commission the right to use his or her name, address, and photograph to publicize his or her winnings.

(g) Indemnification of the Commission for any loss occasioned by an untruth or misrepresentation by the ticket owner or the person claiming the prize in his or her behalf;

(h) All information requested by the Commission which may include, but not be limited to, the prize ticket owner's name, address, and social security number or taxpayer's identification number.

The Mobile Claim Process may incorporate any other provision which the Director, may from time to time, deem necessary and proper to protect the Commission and the public welfare.

(4) List of Winning Tickets. Lottery offices and Sales Agents will be provided with a sufficient number of lists containing certain winning Lottery numbers for the prior 52 weeks which will be available to the public view at each location transacting Lottery business.

(5) Lottery Payment Verification.

(a) For Mobile Claims, the Lottery must be assured that the ticket is a winner and the Mobile Claim Process and such other terms as determined by the Director have been complied with and completed

prior to the ticket's expiration date. Upon validation and verification, the Lottery may provide a single or a variety of payment methods for the claimant to select from in order to receive winnings.

(b) For all other claims, the Sales Agent or claim center reviews the claim form and the ticket and must be assured that the ticket is a winner, that the back of the ticket and the claim form are properly filled out and signed by the claimant, and that the ticket has been presented for payment in accordance with 961 CMR 2.38(2) prior to the expiration date. Upon validation and verification, the prize money will be forwarded and/or provided to the claimant in check form except that the winner of the prize of $100,000.01 or greater must present himself or herself in person at the office of the Director to receive his or her prize, unless he or she is physically or mentally incapable of so doing.

(6) All claims are subject to the M.G.L. c. 10, §§ 22 through 35 and 36, 961 CMR 2.00, and Lottery verification procedures which includes, but may not be limited to, any or all claim procedures required by any multi-state agreements to which the Lottery is subject. If the claim is invalidated, the claim is denied and the Director will promptly notify the claimant. The claimant, if aggrieved, shall have a right pursuant to M.G.L. c. 30A to appeal the decision to the Commission. Any such appeal shall be in writing and made within 30 days of the giving of Notice of the Director's determination.

(7) In accordance with M.G.L. c. 30A, § 11(7), if less than a majority of the Commissioners of the Massachusetts State Lottery Commission are present at a hearing, no party shall be entitled to a tentative or proposed decision, unless such party makes written request in advance for such tentative or proposed decision.

(8) If a claimant is aggrieved by the Director's denial of his or her claim for a prize, he or she may request an informal hearing with the Director to discuss his or her grievances and a reconsideration of his or her claim by the Director. If the Director concludes that there is a meritorious basis for the claimant's complaint, he or she may revise his or her prior decision or refer the matter to the Commission for its determination.

(9) The Director may establish procedures other than those specified in 961 CMR 2.00 for claiming and paying prizes of less than $601.00. Such procedures shall be set forth in Administrative Bulletins issued by the Director.

(10) In the event a claim is based on a ticket which is incomplete or nonconforming or in any way defective, invalid or void as determined by the Director, the limit of the Commission's liability shall be, at its option, the price of the ticket or replacement thereof.

(11) If a prize won is an opportunity to participate in a televised drawing, said opportunity shall be personal to the owner or holder of any ticket winning such prize and, except as authorized by the Director in writing, no person other than said owner or holder shall be entitled to participate in said televised drawing.

(12) COVID-19 State of Emergency. Notwithstanding any other provision in 961 CMR 2.00, with respect to on-line tickets and instant tickets that have a claim expiration date on or after March 19, 2020, the

expiration date for such on-line tickets and instant tickets shall be June 30, 2020, or later dates as set forth in Administrative Bulletins issued by the Director, and such claims may be presented to the office of the Director. For purposes of 961 CMR 2.38(11), on-line tickets include tickets for all draw games and monitor games.

961 CMR 2.38 -- Amended by Mass Register Issue 1317, eff. 7/15/2016. Amended by Mass Register Issue 1396, eff. 5/2/2019. Amended by Mass Register Issue 1416, eff. 4/17/2020. Amended by Mass Register Issue 1421, eff. 4/17/2020. Amended by Mass Register Issue 1443, eff. 4/21/2021. Amended by Mass Register Issue 1446, eff. 6/11/2021. Amended by Mass Register Issue 1447, eff. 4/21/2021.

| ADDEN DUM 2 | |
|---|---|
| | |
| **CHART OF STATEMENTS** | **MADE IN INDICTMENT** |
| | |
| ¶7.      Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the Internal Revenue Service (the "IRS"). | This is a non-accusatory and innocuous statement that requires presents a question of law. |
| 8.      Gambling income is fully taxable and must be reported to the IRS.   Gambling income may include, but is not limited to, winnings from state lotteries. | This is a non-accusatory and innocuous statement that requires presents a question of law. |
| 9.      Gambling losses may not be used to offset gambling income from sources other than a taxpayer's own gambling activity. | This is a non-accusatory and innocuous statement that requires presents a question of law. |
| | |
| I 0.      Lotteries, sweepstakes, race-track, and other gambling operators are required to report to the IRS on a Form W-2G each transaction in which net winnings exceed $600 and are at least 300 times the amount of the wager.   The Form W-2G reports to the IRS the winner's name, address, and taxpayer identification number, as well as the amount of the gambling income and any taxes withheld. | This is a non-accusatory and innocuous statement that requires presents a question of law. |
| 11.      Massachusetts General Law Chapter 10, Section 29 prohibits the sale of lottery tickets or shares by anyone other than a licensed lottery agent and provides that violations are punishable by a fine.  MGL 30 § 29. | This is a non-accusatory and innocuous statement that requires presents a question of law. |
| 12.      The Lottery Commission requires winners to declare on a claim form, under penalty of perjury, that the name, address, and taxpayer identification number listed on the Form W-2G are correct, and that the signatory is "the sole recipient of this payment; and that [the signatory | This is a non-accusatory and innocuous statement that requires presents a question of law. |

| | |
|---|---|
| is] not claiming th[e] prize to assist another in the avoidance of financial obligations." | |
| 13.     The Lottery Commission submits the information obtained on the W-2Gs from lottery ticket cashers to the IRS by electronic wire transmission from Massachusetts to the IRS at locations outside of Massachusetts. | Non-accusatory and not an allegation of wrongdoing. |
| 14.     "Ten-percenting" is a practice by which lottery winners seek to evade these IRS reporting requirements and avoid payment of the applicable taxes by having another individual cash the winning ticket(s) on their behalf, under the other individual's name.<br><br>In exchange, the individual who cashes the winning ticket(s) and completes the Form W-2G retains a percentage of the winnings, sometimes as high as 10 or 20 percent of the proceeds. | Non-accusatory and not an allegation of wrongdoing of Jaafars<br><br><br><br><br><br>Non-accusatory and not an allegation of wrongdoing of Jaafars |
| 16. In 2019, Ali Jaafar was the top individual lottery ticket casher for the state. Mohamed Jaafar was the 3rd highest individual ticket casher, and Yousef Jaafar was the 4th highest individual ticket casher. | Non-accusatory and not an allegation of wrongdoing |
| 18.     Between on or about March 23, 2020 and on or about June 12, 2020, the Defendants together claimed approximately $360,807.00 in Massachusetts lottery winnings by submitting the claims through the mail as set forth below: | Non-accusatory and not an allegation of wrongdoing. |
| 20.     From at least 2011 through at least June 2020, the Defendants conspired with others known and unknown to the grand jury to carry out a scheme to defraud the United States of federal income taxes on Massachusetts state lottery winnings. | Before the 2018 Directive -- Not delegated to collect or protest federal tax .<br><br>All taxes on the lottery winnings were automatically aid at the redemption |
| 21.     From at least 2011 through at least June 2020, the Defendants conspired with others known and unknown to the grand jury to launder the funds from Massachusetts state lottery winnings of others. | Beyond the scope of the Lottery Laws |

| | |
|---|---|
| 22. The object of the conspiracies was to profit by avoiding the payment of federal income taxes and other financial obligations and improperly claiming tax refunds by purchasing winning lottery tickets from the ticket holders at a discount, redeeming them with the Lottery Commission, receiving the proceeds, and offsetting reported winnings with falsely claimed gambling losses. | This is a question of law related to how losses are determined, |
| a. Having lottery agents and convenience store staff purchase winning lottery tickets from the ticket holders for cash at a discounted price; | Non-accusatory and not an allegation of wrongdoing of Jaafars |
| b. Providing purchased tickets to the Defendants who either directly or indirectly redeemed the tickets at the Lottery Commission. | This is a non-accusatory and innocuous statement that requires and presents a question of law. |
| c. Presenting the Lottery Commission with false claim forms in which they declared, under the pains and penalties of perjury, that the winnings were their own. | This is a question of law because the form neither asks that question. It involves a question of law. |
| d. Cashing the checks provided by the Lottery Commission for the winning tickets. | Does not set out an element of money laundering and non-accusatory. |
| e. Reimbursing the lottery agents for the lesser amounts they paid the actual ticket holders; and | Is a question of law |
| f. Falsely reporting the lottery income on the Defendants' tax returns as the proceeds of personal gambling activity, and offsetting that income with purported equivalent gambling losses. | Is a question of law |
| 25. On or about April 29, 2016, Ali Jaafar cashed a $20,000 Massachusetts state lottery ticket that he had purchased from a convenience store owner for cash at a discounted price.   In order to cash this winning ticket, Ali Jaafar signed a Lottery Commission claim form in which he falsely declared, under pains and penalties of perjury, that he was the "sole  recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist  another in the avoidance of financial obligations." | Is a question of law |

| | |
|---|---|
| 26.     On or about March 23, 2018, Ali Jaafar cashed a winning $1,000 Massachusetts state lottery ticket that a convenience store owner had purchased for cash at a  discounted price. In order to cash the winning ticket, the co-conspirator had purchased, Ali Jaafar signed a Lottery Commission claim form in which he falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations." | Is a question of law |
| 27.     On or about July 22, 2019, Ali Jaafar cashed 10 winning lottery ticket and, for each of these winning tickets, signed Lottery Commission claim forms in which he falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was not "not claiming [the] prize to assist another in the avoidance of financial obligations." | Is a question of law |
| 28.     On or about July 22, 2019, MOHAMED JAAFAR cashed 9 winning lottery tickets, and for each of these winning tickets, he signed Lottery Commission claim forms in which he falsely declared,  under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery  payment and that he was "not claiming [the] prize to assist another in the avoidance of financial  obligations." | Is a question of law |
| 29.     On or about July 22, 2019, YOUSEF JAAFAR cashed 6 winning lottery tickets and for each of these winning tickets, he signed Lottery Commission claim forms in which he falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of  financial obligations." | Is a question of law |
| 30.     On or about October 17, 2019, a staff person at a Somerville, Massachusetts convenience store purchased a $1,000 winning | Non-accusatory and not an allegation of wrongdoing. |

| | |
|---|---|
| lottery ticket at a discount.   Over the next several hours, MOHAMED JAAFAR called a phone number registered to the owner of that Somerville convenience store six times. | |
| 31.      On or about October 18, 2019, acting at the direction of YOUSEFF JAAFAR, CC-1 cashed the $1,000 lottery ticket that had been purchased at a discount the day before at the Somerville convenience store.   In order to cash this winning ticket, CC-1 signed a Lottery Commission claim form in which he falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations." | Is a question of law |
| 32.      On or about May 4, 2020, ALI JAAFAR signed and submitted a Lottery Commission claim form for a Massachusetts lottery ticket that he purchased at a discount from a convenience store representative.   In this claim fo1m, ALI JAAFAR falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations." | Is a question of law |
| 33.      On or about June 1, 2020, ALI JAAFAR went to the Lottery Commission office in Woburn to  cash a claim for a $10,000.00 that he purchased at a discount from a co-conspirator. In this claim form, ALI JAAFAR falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations." | Is a question of law |
| 34.      On or about February 20, 2020, YOUSEF JAAFAR provided nine winning lottery tickets totaling $9,900 as well as completed claim forms for those lottery tickets to CC-2, who cashed those tickets at the Massachusetts Lottery Office in Woburn, Massachusetts.   In this claim form, CC-2 falsely declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and | Is a question of law |

| | |
|---|---|
| that he was "not claiming [the] prize to assist another in the avoidance of financial obligations." | |
| 35.    On or about February 20, 2020, YOUSEF JAAFAR and CC-2 cashed the lottery checks for the nine tickets provided by the Massachusetts Lottery to this co-conspirator at the People' s United Bank, which is a financial institution within the meaning of 18 U.S.C. § 20. | Non-accusatory and not an allegation of wrongdoing of Jaafars |
| 36.    From at least in or about January 2011 through 2019, ALI JAAFAR cashed more than $15 million in claimed winning Massachusetts state lottery tickets worth $600 or more each that had been acquired for cash at a discount from the actual ticket holders. | Non-accusatory and not an allegation of wrongdoing. |
| 37.    In each of those tax years, however, ALI JAAFAR falsely reported the income from cashing the winning tickets of others as his owm gambling winnings and claimed an offset to virtually all his gambling winnings with alleged gambling losses. As a result, ALI JAAFAR paid less than $24,500 in federal taxes on these winnings and received a total of approximately $886,261.00 in tax refunds for tax years 2011-2019. | Is a question of law |
| 38.    For example,on or about January 30, 2020, ALI JAAFAR signed and caused to be submitted  to the IRS a U.S. Individual Tax  Return for calendar year 2019 in which he improperly claimed a  tax refund by repmiing as gambling winnings money he had received by cashing lottery tickets other individuals, while offsetting that income by also reporting purported gambling losses. MOHAMED JAAFAR's False Tax Returns | Is a question of law |
| 39.    From at least in or about January 2012 through 2019, MOHAMED JAAFAR cashed more than $3.3  million in claimed winning Massachusetts state lottery tickets worth more than $600 that had been  acquired for cash at a disc0tmt from the actual ticket holders. | Is a question of law |
| 40.    In each of those tax years, however, MOHAMED JAAFAR falsely reported the income from cashing the winning tickets of others as his | Is a question of law |

| | |
|---|---|
| own gambling winnings and claimed an offset to virtually all his gambling winnings with alleged gambling losses. As a result, MOHAMED JAAFAR paid less than $21,700 in federal taxes on these winnings and received a total of approximately $106,032.00 in tax refunds for tax years 2012-2019. | Non-accusatory and not an allegation of wrongdoing. |
| 41. For example, on or about March 19, 2020, MOHAMED JAAFAR submitted a U.S. Individual Tax Return for calendar year 2019 in which he improperly claimed a tax refund by reporting as gambling winnings money he had received by cashing lottery tickets of other individuals, while offsetting that income by also reporting purported gambling losses. YOUSEF JAAFAR's False Tax Returns | Non-accusatory and not an allegation of wrongdoing. |
| 42. From at least in or about January 2013 through 2019, YOUSEF JAAFAR cashed more than $2.4 million in claimed winning Massachusetts state lottery tickets worth more than $600 that had been acquired for cash at a discount from the actual ticket holders. | Non-accusatory and not an allegation of wrongdoing. |
| 43. In each of those tax years, however, YOUSEF JAAFAR falsely reported the income from cashing the winning tickets of others as his own gambling winnings and claimed an offset to virtually all his gambling winnings with alleged gambling losses. As a result, YOUSEF JAAFAR paid less than $10 ,700 in federal taxes on these winnings and received a total of approximately $185,951 in tax refunds for tax years 2013-2019. | Is a question of law |
| 44. For example, on or about February 13, 2019, YOUSEF JAAFAR submitted a U.S. Individual Tax Return for calendar year 2019 in which he improperly claimed a tax refund by reporting as gambling winnings money he had received by cashing lottery tickets of other individuals, while offsetting that income by also reporting purported gambling losses. | Is a question of law |
| The Grand Jury charges: | Is a question of law |

| | |
|---|---|
| 46.    From at least in or about 2011 through June 2020, in the District of Massachusetts and elsewhere, the defendants, (I) ALI JAAFAR, (2) MOHAMED JAAFAR, and (3) YOUSEF JAAFAR, conspired with others known and unknown to the Grand Jury to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of the revenue, to wit, federal income taxes. All in violation of Title l 8, United States Code, Section 371. | |
| | |
| The Grand Jury charges: 48.    From in or about 2011 through in or about June 2020, in the District of Massachusetts and elsewhere, the defendants, (1) Ali JAAFAR, (2) MOHAMED JAAFAR, and (3) YOUSEF JAAFAR, conspired with each other and with others known and unknown to the Grand Jury to:  (a)  conduct and attempt to conduct financial transactions, to wit, the deposit and cashing of  checks from the Massachusetts Lottery, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds  of specified unlawful activity, that is, mail and wire fraud, in violation of Title 18, United  States Code, Sections 1341 and 1343, with the intent to promote  the carrying  on of the specified   unlawful  activity, in  violation  of Title  18, United  States Code, Section l 956(a)(l )(A)(i); (b) conduct and attempt to conduct financial transactions, to wit, the deposit and cashing  of  checks  from  the  Massachusetts Lottery  Commission,  knowing  that  the property involved  in such  transactions represented  the  proceeds  of some  form  of unlawful activity, and which in  fact involved the proceeds of specified unlawful activity, that is, the illegal sale of lottery tickets in violation of Massachusetts General Laws Chapter | Is a question of law |
| The Grand Jury further charges: | Is a question of law |

| | |
|---|---|
| 49.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-44 of this Indictment.<br>50.     On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,<br>(1)     ALI JAAFAR,<br>did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, and Other Income Type and Other Miscellaneous Deductions Statements attachment thereto, for the tax years set forth below, which returns were verified by written declaration that they were made under the penalties of perjury, and which were filed with the Director, Internal Revenue Service, and which returns and attachments thereto the defendant did not believe to be true and correct as to every material matter, in that the defendant knowingly and falsely claimed the amounts listed below as his and his spouse's own gambling winnings, and improperly offset that income by claiming other purported gambling losses, as listed below: | |
| | |
| (2)     MOHAMED JAAFAR,<br>did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, and Other Income Type and Other Miscellaneous Deductions Statements attachment thereto, for the tax years set forth below, which returns were verified by written declaration that they were made under the penalties of perjury, and which were filed with the Director, Internal Revenue Service, and which returns and attachments thereto the defendant did not believe to be true and correct as to every material matter, in that the defendant knowingly and falsely claimed the amounts listed below as his and his spouse's own gambling winnings, and improperly offset that income by claiming other purported gambling losses, as listed below: | Is a question of law |
| | |
| The Grand Jury further charges:<br>    53. The Grand Jury re-alleges and incorporates by reference paragraphs 1 - 44 of this Indictment. | Is a question of law |

| | |
|---|---|
| 54. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant, (3) YOUSEF JAAFAR, did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, and Other Income Type and Other Miscellaneous Deductions Statements attachment thereto, for the tax years set forth below, which returns were verified by written declaration that they were made under the penalties of perjury, and which were filed with the Director, Internal Revenue Service, and which returns and attachments thereto the defendant did not believe to be true and correct as to every material matter, in that the defendant knowingly and falsely claimed the amow1ts listed below as his and his spouse's own gambling winnings, and improperly offset that income by claiming other purported gambling losses, as listed below: | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |