UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-10248-NMG |
| | ) | |
| YOUSEF JAAFAR, | ) | |
| | ) | |
| Defendant. | ) | |

**YOUSEF JAAFAR'S SENTENCING MEMORANDUM
AND REQUEST FOR VARIANCES AND DEPARTURES**

## I.   Introduction

At sentencing an inquiry into the substantive reasonableness of a sentence must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *United States v. Gall*, 552 U.S. 38, 51 (2007).   "The hallmarks of a substantively reasonable sentence are `a plausible sentencing rationale and a defensible result.'" *United States v. Zapata-Vázquez*, 778 F.3d 21, 24 (1st Cir. 2015) (quoting *United States v.* Martin, 520 F.3d at 96). The Sentencing Guidelines are only one factor for the Court's consideration in imposing a sentence. *United States v. Booker*, 543 U.S. 225 (2005).  First, though the Court calculates the guideline range and, after arguments by the parties, it "consider[s] all of the §3553(a) factors to determine whether they support a sentence requested by a party." *United States v. Gall*, 552 U.S. 38, 49-50 (2007). Ultimately, the Court must craft an individualized sentence that is "*minimally* sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added).

The Court may vary from the sentencing guidelines based on the § 3553(a) factors, including the characteristics of the defendant. *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008). The ultimate sentence must be individualized and must comport with the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

In applying these principles to this case, a strong argument is made to sentence Yousef Jaafar to home confinement followed by three years supervised release enabling him to continue his medical treatment and management of the incurable disease from which he suffers.[1]

## II.     Yousef Jaafar's History and Characteristics: A Relevant §3553(a) Factor

### A.  Yousef's Traumatic Childhood

Yousef, who was born on January 25, 1993 in Massachusetts to Muslim parents (See ¶ 66 of the PSR), grew up in the shadow of the 9/11 attacks.  He was 8 years old and in the third grade when planes struck the World Trade Center, Pentagon, and Shanksville.  It was a confusing time for him.  He loved his Watertown neighborhood and yet at school was bullied by other children because he was a Muslim, with recognizable Muslim facial features, and a quintessential Muslim name. After 9/11 Muslims in America became targets of anger and racism.  See https://abcnews.go.com.  News reports on tv and in the newspapers showed nightly anti-Muslim protests with hate crimes spiking 500% from 2000-2009. See www.npr.org/9/9/21.  He watched news reports of Muslims entering the United States who were detained by the thousands under a Bush administration policy.  Turmoil during that time weighed heavily on Yousef and he carried a lot of fear not knowing where the anti-Muslim protests would lead or whether war would break out.

His fears were not unfounded given his personal family history.  Yousef's father, Ali Jaafar,  was born in Lebanon, a small middle eastern country on the continent of Asia, and lived the first 17 years of his life there.  As a child he witnessed first-hand a brutal civil war.  His parents, who lived in Sierra Leone on the continent of Africa, summonsed him at the age of 18 to live with them in that country even though Ali had never been to Sierra Leone and knew nothing about its vastly different culture.  Little did he know that he would find himself in the middle of yet another ferocious civil war, this time on a far

---

[1] Yousef Jaafar shall be referred to throughout as "Yousef" to avoid confusion with his father, Ali Jaafar.

away continent.  Ali remained in Sierra Leone for the next 17 years and witnessed brutal atrocities and horrendous deprivations.

His father's experiences in two worn-torn countries on separate continents informed young Yousef that war was not beyond the realm of possibility anywhere.  Yousef, who was the youngest of four siblings, internalized his fears without confiding in his parents the depth of his anxiety to prevent them from worrying about him.  Anxiety eventually took its toll on his physical health and when he was 14 years old he was diagnosed with ulcerative colitis, a chronic inflammatory bowel disease affecting his digestive tract.  See ¶ 78 of the PSR.  It is a disease that can lead to life-threatening complications, has no cure, and is exacerbated by stress[2].   See letter by Dr. Del Santo, attached as Exhibit A. He must be examined often by his doctor, undergo frequent colonoscopies, take medication at regular intervals four times per day, and strictly manage his diet daily to control the symptoms merely to keep his colitis under control.  Failure to adhere to the treatment protocol can lead to fatal consequences.

### B.  Fear of Abandonment

Another cause of Yousef's anxiety stems from his father's abandonment by both parents when he was a child.  His father was left alone as a minor along with his minor siblings in Lebanon without adult supervision while his parents emigrated to Sierra Leone.  Ali and his siblings were placed in a "boarding" school, the Lebanese equivalent of an orphanage, without any adult relatives to look after them. His mother rarely visited and his father returned some summers.  Yousef's father was bereft and tried to make the best of his inescapable situation.  Stories told to Yousef by his father of his parents' flight to Sierra Leone haunted him.  He couldn't fathom how his father could have endured such deprivation or how his grandparents could desert their minor children.  As a loving son, Yousef empathized with his father showering him with unconditional love hoping to ameliorate the harsh reality

---

[2] Yousef's ulcerative colitis will be discussed in further detail in § III  herein in support of a lenient sentence where he can continue to receive medical treatment.

of his father's cruel abandonment.  Yousef sought to be the calm to his father's storm.  He wanted to make his life in America filled with love and peace.  He strove to become the son who did not contribute to his father's turmoil and tried to assuage his father's constant nightmares.  Living at home continuously even as an adult is one of the ways Yousef continues to watch over his father.  See ¶75 of PSR.

However, being a good son took a psychological toll on Yousef. To that son who knew his paternal grandparents were capable of leaving their children in Lebanon while they worked on another far away continent even though war was brewing in Lebanon, Yousef was gripped with the fear that it could happen to him and his father could abandon him.  He cleaved to his father more tightly and became the obedient child doing all he could to avoid being abandoned.  Yousef does not want to suffer the same fate as his father.

His childhood, and indeed, young adulthood, have been shaped, consumed, and marred by these tragic internal and external events, leading to serious untreated psychological issues and major medical problems.  Indeed, his characteristics and history are unique in the literal meaning of that word and are what post-*Booker* case law had in mind in requiring courts to take a defendant's individualized history and characteristics into consideration at sentencing.  See *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008).

### III.    Yousef's Major Health Problem: A Relevant § 3553(a)(2)(D) Factor

Doctor David Del Santo, who specializes in Internal Medicine and Infectious Diseases, diagnosed Yousef with ulcerative colitis in 2004 and continues treating him.  See Exhibit A.  He describes Yousef's form of ulcerative colitis as an "inflammatory bowel disease that causes chronic inflammation and ulcers in the superficial lining of his large intestine, including his rectum." *Id.*

Dr. Del Santo describes Yousef's symptoms as follows:

4

Yousef has suffered from painful and debilitating bouts of UC since 2004.  His symptoms include diarrhea, sometimes with blood or pus, abdominal pain and cramping, and rectal pain and bleeding, fatigue, and loss of appetite on occasion.

See Exhibit A.

If not properly treated, the consequences are dire:

If left untreated or treated improperly, it can lead to serious complications including severe bleeding, severe dehydration, a perforated colon, an increased risk of blood clots in his veins and arteries, and inflammation of his skin, joints and eyes. It can also increase his risk for colon cancer.

See Exhibit A.

A major component in Yousef's treatment protocol is the prescription medication Lialda, a delayed release medication, taken four times per day at regular intervals.  *Id.*  It is imperative to take the medication on time to always have a continuous amount in his system.  If a dose is missed or not administered on time, his symptoms begin to re-emerge.

While medication is a means by which to help control his symptoms, it is not a cure. Yousef will continue suffering from ulcerative colitis for the remainder of his life and he must be scrupulous with his treatment regimen to prevent the disease from worsening or becoming cancerous. As Dr. Del Santo acknowledged:

There is no cure for UC and it is imperative that Yousef take his medication as prescribed without alteration, manage his level of stress, and stay away from [certain] foods ….

See Exhibit A.

Stress can exacerbate the symptoms of ulcerative colitis causing a "significant adverse effect on his health."  See Exhibit A ("Ulcerative colitis also can be emotionally challenging, and stress can exacerbate his symptoms and have significant adverse effects on his condition.").  As Dr. Del Santo notes, it is imperative for Yousef to manage his stress.  It is not possible to do so in a prison environment where he lacks control.

To manage flare-ups, Dr. Del Santo recommends that Yousef "(1) eat small meals 5-6 times per day, (2) refrain from dairy products and nuts, (3) continue with a daily exercise program, and (4) manage his stress." See Exhibit A. Given the strictly regulated and uniform manner of treating its inmates, the BOP is not constructed to deliver the individualized care Yousef needs to manage the symptoms of his ulcerative colitis and the PSR fails to address treatment options.

Beyond the day-to-day care, Yousef must continue to have ready access to healthcare monitoring and frequent colonoscopies (It is imperative that Yousef continue to have access to routine healthcare monitoring including regular assessment by a medical professional with expertise in the care of ulcerative colitis. He must also undergo colonoscopies every 12 months.") See Exhibit A. The purpose of the colonoscopies is to look for cancerous tumors in his colon. Yousef's risk for developing colon cancer increases if his treatment protocol is altered or largely ignored. The reason is that inflammation in his colon must be kept under control otherwise changes in the cells of his colon will become more prevalent leading to the possibility of colon cancer. Yousef has dedicated hours of his daily routine to assure that he is taking necessary steps to keep his colitis under control. Confinement in a structured prison environment will interfere with the relative success he has achieved.

The Justice Department's Office of the Inspector General issued an audit report in 2008 that found that "about 16% of the time, inmates …did not receive the monitoring and follow up that was expected." *Id.* ¶ 6 and fn 1. There is no published information that the BOP's failure to meet its own standards of care has been rectified since the 2008 report. This is because a 2016 Department of Justice-Office of Inspector General Report found that the BOP's recruitment and retention of healthcare professionals is a serious challenge. *See* Report on the Federal Bureau of Prisons' Medical Staffing Challenges, dated March 28, 2016.[3]

---

[3] There are no follow up OIG reports addressing medical staffing shortages since the 2016 report.

Like heart disease, diabetes, lupus, and other chronic medical conditions, colitis requires vigilant and constant monitoring on a daily basis. Disruption of the treatment protocol can have dire consequences on his health and is not providing and administering needed medical care "in the most effective manner."  See §3553(a)(2)(D).  "A court may find [the requisite] extraordinary impairment when imprisonment would threaten or shorten a defendant's life[.]" *Martin*, 363 F.3d at 49.

In sum, a prison sentence would hasten a worsening of existing symptoms and deterioration of his colon, leading to possible colon cancer.  Indeed, any change in the regimen prescribed by Dr. Del Santo could be potentially life threatening.  Home confinement allows Yousef the ability to continue successfully treating his disease and compared to the likely deterioration of his condition if incarcerated, is warranted.

## IV.    The Money Laundering Conviction Drives the Guidelines, Are Substantively Unreasonable, and Generally Disregarded at Sentencing

Congress did not enact money laundering statutes to add to the penalties for various crimes in which defendants make money.  *United States v. Fallon,* 61 F.4th 95 (3rd Cir. 2023).  Guidelines for money laundering offenses are unjustifiably harsh and out of sync compared to guidelines for predicate offenses.  There is ample support in case law, Sentencing Commission statistics, and in the sentences handed out over the last 10 years in this Court for money laundering convictions for our position.  In this case, they escalate the tax fraud guidelines from a total offense level of 24 to 33, an irrational increase without concomitant foundation. Yousef requests that this Court reject the money laundering sentencing guidelines calculations in the PSR because they are overly punitive.

### A.    *U.S. v. Fallon* Is Remarkably Instructive in Guiding This Court Here. The Need to Avoid Disparities: Another § 3553(a) Factor

*United States v. Fallon,* 61 F.4th 95 (3rd Cir. 2023) demonstrates the more moderate and evolving view in applying the money laundering statute to the sentencing guidelines.  It should be adopted here. The case originated in the District Court in Pennsylvania charging a brother, sister and the corporation

they ran in a scheme involving receipt of refunds from pharmaceutical manufacturers for unused or expired medications without paying those receipts to their clients.[4] The Indictment alleged that the refund scheme was ongoing for almost 12 years (a scheme similar in duration to this case) before defendants were arrested and over that time defendants laundered $180,000,000.00 (a notable increase in the amounts in this case). Defendants, who were the CEO, CFO, and their corporate incarnation, were convicted at trial of money laundering under 18 U.S.C. § 1956(h), the same statute used in this case, as well as with numerous other fraud-related charges such as mail fraud, wire fraud, and theft of government property.

At sentencing, the CEO was sentenced to 5 years, the CFO was sentenced to 1 year and a day, and the corporate defendant was sentenced to 5 years of probation, a major downward departure/variance from the guidelines. In imposing a 5-year sentence against the CEO in *Fallon*, the judge sentenced at the equivalent of a total offense level of 24, completely disregarding what must have been a total offense level substantially higher given the amount of laundered funds. In imposing a 1-year sentence against the CFO in *Fallon*, the judge sentenced at the equivalent of a total offense level of 10, even though her total offense level also had to have been astronomically higher given the amount of laundered funds.[5] In this case, the $21,000,000.00 in laundered funds is a little more than 10% of the $180,000,000.00 in *Fallon.* A mathematically equivalent sentence here would be 0-7 months adopting the 5- year sentence the CEO received, or the 1 year sentence the CFO received.[6]

The money laundering guidelines in *Fallon* were disregarded even though defendants were convicted after trial. For both the CEO and CFO, the district court's sentences represent a sentence that

---

[4] See *United States v. Devos, Ltd.,* Case # 14-00574 filed in the Eastern District of Pennsylvania.
[5] We are unaware of any departure on medical grounds.
[6] We will argue *infra* that Yousef should not even receive the same equivalent sentence as the Fallon CEO giving other departures/variances he is entitled to under the guidelines.

is "*minimally* sufficient to achieve the broad goals of sentencing."   There is no reason a similarly proportional result should not be attained here.

Further, on restitution and forfeiture rulings, notwithstanding that the laundered funds were $180,000,000.00, the district court ordered restitution against the CEO and the corporation jointly and severally of $95,253,089.00 representing  less than half of the total $180,000,000.00 and a forfeiture judgment of $114,832,445.00 against the corporation representing roughly 64% of the total $180,000,000.00.[7]  A similar mathematical equivalency should result here.

Despite the fact that the District Court imposed a lenient sentence vis-à-vis the guidelines, the CEO, CFO and corporation appealed.  The Third Circuit vacated appellants' convictions for conspiracy to commit money laundering remanding for resentencing, including a recalculation of the forfeiture award.  The Third Circuit agreed with appellants' argument that the evidence was insufficient for a reasonable jury to find that they conspired to engage in financial transactions designed to conceal the nature or the source of the proceeds from the fraud scheme.  See *Fallon,* 61 F.4[th] 95, 115, an argument that is equally applicable here.[8]   It is reasonable to infer that the District Court will impose a far lesser sentence, if any at all, at resentencing. Resentencing by the District Court is currently scheduled for May 23, 2023.

In this case, the amount of laundered funds on which the PSR calculated the guidelines was $21,000,000.00 and the Total Offense Level was calculated at 33 representing a sentence on the low end of 135 months. The scheme in this case involved convenience store owners/licensed lottery agents who used Ali Jaafar to cash lottery tickets that their customers won because they could not take the chance of

---

[7] It is important to point out that the corporate defendant can file bankruptcy to seek discharge of the forfeiture judgment. Given that the forfeiture judgment is larger than restitution, the corporation may have reaped a windfall. Because there is no corporation in this case, the individual defendants will be burdened with restitution without passing it off to a corporation like *Fallon*.

[8] A discussion of the merits of the appeal are beyond the scope of this sentencing memorandum and more appropriate for appeal.

cashing in the Lottery tickets themselves without arousing suspicions and without jeopardizing revocation of their Lottery license.  The convenience store owners took approximately 90% of the value of each ticket.  No one knows what they did with the money or whether they paid taxes on it.

There was no testimony at trial showing the percentage that the convenience store owners/licensed lottery agents gave to its customers/winners, except for one witness, Lina Ghantous and her testimony centered on only a one time sale and cannot be relied on as representative.  If the other convenience store owners exploited their customers the way they exploited defendants, it is quite likely that the convenience store owners/agents were the real beneficiaries of the scheme.

There is a paucity of evidence from the multiple convenience store owners testifying about their communications with Yousef in connection with the offense or establishing who was the progenitor of the scheme – them or Yousef.  Since the government did not elicit testimony from any original ticket winners at trial there is no evidence showing their role in the offense or how much money they received.  There is no evidence that defendants had any contact or communication with the original winners of any kind at any time.  The government does not dispute that the convenience store owners/agents were paid between $750 and $850 for every $1,000 ticket.   See ¶ 13 of the PSR. Yet, there is no evidence of whether the convenience store owners/agents shared any of the $750-850 with the original winners. It is plausible that they did not share the majority of $750-850, as a matter of logic.  Convenience store owners/agents controlled the narrative.  They alone communicated with the Jaafars and did not connect the winners with the Jaafars.  It was beneficial for the convenience store owners to control the transactions and separate the winners from the Jaafars where the Jaafars could directly give them the so-called agreed amount.  Only the convenience store owners knew how much money they paid to the winners and the government did not call any of the winners as witnesses at trial.  The convenience store owners had an incentive in continuing to have defendants cash lottery tickets and to make the scheme financially worth the while.   Regardless, defendants received approximately 10% of each ticket and did

not make $21,000,000.00.  While defendants take responsibility for their actions, assessing

$21,000,000.00 results in unjust.

    **B.**    **Money Laundering Guidelines as Cudgels**

*Fallon* didn't mince words in expressing its opinion of the money laundering guidelines remarking

that:

> …financial penalties demonstrate how tacking on a money
> laundering charge can vastly extend the prosecution's reach.
> At best, it could subject companies to enormous forfeiture
> obligations based on relatively minor fraud schemes.
> At worst, it could motivate prosecutors to bring money
> laundering charges in almost every fraud case.

*Fallon,* 61 F.4th 95, 116.

Here, by charging under the money laundering statute, the government may have inadvertently

or intentionally used it as a cudgel to chill defendants' constitutional right to a trial for fear that a

guidelines sentence for money laundering would vastly increase the guidelines for the predicate

offense.[9]  Defendants should not be penalized at the sentencing phase of the case for exercising their

right to take this case to trial.

The Third Circuit in *Fallon* recognized the problem by commenting on the implications of

reliance on money laundering guidelines.  Its insights apply here.

> in many cases, the addition of a money laundering charge can
> result in ... a sentence that is much larger than the sentence for
> the predicate offense." ….

*Fallon,* 61 F.4th 95,116.

In this case, tacking on a money laundering charge in fact greatly extended the prosecutors'

reach, just like it did in *Fallon,* given that the base offense level of the tax fraud guidelines were many

---

[9] We also point out that in this case the government took the draconian step of pitting father against one of his sons and siblings against one another to cause a Solomonic clash and put additional pressure on the defendants to forgo their constitutional right to trial.  Mohammed Jaafar was on the government's witness list for trial and prepared him to testify against his father and brother.

steps lower than the money laundering guidelines.  Further, the $21,000,000.00 was assessed to defendants without regard to whether others shared in that amount.  In *Fallon* this issue did not come into play because the CEO and the CFO were the only ones responsible for the $180,000,00.00.  They received 100% of the total. In this case, the record is clear that defendants received about 10% of the total while the original ticket winners and the convenience store owners/lottery agents received 90% of the total value of the lottery tickets.  Assessing these defendants with any amount over $2,100,000.00 fails to reflect how the scheme was carried out, who participated in it, who was not indicted, and who else owed taxes on the Lottery tickets.  This Court has the authority to rectify that problem by rejecting the money laundering guidelines here.

Like *Fallon*, the addition of a money laundering charge against Yousef and Ali should not result in a sentence that is much larger than a sentence for the predicate offense or the many unindicted co-conspirators who shared culpability but are not facing repercussions for their actions in the scheme.  It must also reflect the fact that others who were significantly more involved have not been held accountable.

## V.      Statistics Bear Out Variances and Departures for Money Laundering Sentences

Nearly every indictment involving money, such as bribery, securities fraud, insurance fraud, tax fraud, mortgage fraud, narcotics trafficking, and the like, could invariably include money laundering charges.  But only a small percentage of cases in this district charge money laundering.

In fact, money laundering offenses decreased by 23.5% in fiscal year 2017, the most recent data published by the Sentencing Commission.  An examination on PACER of cases in this district from January 2, 2010 to March 31, 2023 shows that only a meager 115 cases contained a money laundering charge.  See Pacer for USDC cases.  There is no discernible pattern or even explanation in those cases why there were so few money laundering charges to differentiate them from the thousands of other white-collar cases filed in that same time period.

Sentences on money laundering cases in which convictions resulted show that the court imposed a below guidelines sentence even rejecting the government's sentence recommendation.  *Id*. In fiscal year 2021, Sentencing Commission statistics show that in this district, the median sentence on a money laundering conviction was 23 months and there were zero sentences of over 120 months. See USSG 2017-2021 Datafiles, USSCFY17-USSCFY21.

On a national level, the same rate of departures for a money laundering conviction tracks this district in terms of the relatively scant number of money laundering convictions and the percentage of below guidelines sentence imposed.  There have been 831 money laundering convictions nationally in fiscal year 2021 and of those cases 43.7% received a downward variance and 8.4% received a departure.  See USSC Quick Facts, Money Laundering Convictions at wwwussc.gov/research/quick facts. The average reductions were 47.3% and 46.6% respectively.  *Id.*  These percentages do not consider departures for substantial assistance or for defendants who received no prison sentence which if factored into the above percentages, have the effect of increasing the percentage of downward departures and variances from a guidelines sentence.  We know also that 25% of defendants sentenced at offense level 17 did not receive any sentence of incarceration and we assume that in the lower offense levels, the statistics increase proportionally, at a minimum.  A guidelines sentence of Yousef would be a serious outlier.

VI.    **There Was Insufficient Evidence that Yousef Was Part of the Scheme from the Beginning and He Should Be Held Responsible for a Significantly Lesser Loss**

The Indictment alleged that the ticket scheme began in 2011.  See ¶ 15 of the Indictment.  At trial, the government did not elicit testimony about when Yousef joined it.  He was 18 years old in 2011 and a student in high school.  After graduation he was a full-time student at Suffolk University for the next 5 years while he earned a MBA. There was no testimony or exhibits showing that he participated in the scheme while he was in school.  The government's testimony on this point was ambiguous at best and too unreliable on which to make a determination that the jury made a finding that Yousef began

purchasing tickets when he was 18 years old. The lack of clarity should not form the basis to attribute the entirety of the $21,000,000.00 to him.

### VII.    Like the Money Laundering Guidelines, the Tax Loss Guidelines Are Not A Meaningful Proxy Because the Loss Amount Greatly Exceeds Yousef's Personal Gain

The PSR places Yousef in at a base offense level of 24 based on a tax loss of between $3,500,000.00 and $9,500,000.00. ¶ 38 of the PSR.  The loss range is based on the "gross" amount of taxes that should have been borne by the Yousef, convenience store owners/lottery agents, and the original winners.  The government does not dispute the fact that Yousef received approximately $150.00 for each $1,000.00 winning ticket and the other two received the remainder.

Payment of $750 per ticket for the total amount of all tickets would have been $2,006,808.00 and the cost for a ticket for which he paid $850 would have been $2,274,382. The net difference would be $668,936.00 if paid $750 and $401,361.60 if he paid $850.  Taxed at a rate of 28% (the government's percentage) would result in aggregate taxes owed of between **$112,381 and $187,320** before ordinary deductions.  The corresponding guideline level would be 8-10.

The tax loss figures relied on by the government do not take into account the amounts retained by the convenience store owners/lottery agents, constituting the vast majority of each ticket.  Whether the convenience store owners/lottery agents passed any of the $850.00 to the original owner was not established at trial.  Even assuming they did, taxes should have been paid by them. The participation of the multitude of convenience store owners and the winning lottery ticket winners, both of whom disproportionately benefited by their respective actions, should be taken into account when determining tax loss resulting from Yousef's actions. Defendants did not commit this crime alone. Many people in the community saw an opportunity to avoid the inconvenience and possible expense of properly reporting their winnings. Because the benefit of this crime was widespread, Yousef should not bear the full weight of a guidelines sentence.

**VIII.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct: Another §3553(a) Factor**

**A.  The Clarance Jones Case**

*United States v. Jones,* 19-CR-10122-FDS ("*Jones"*) is a case involving the defendant's purchase of lottery tickets from convenience store owners over multiple years in a similar scheme as this case. The facts are remarkably similar to this case.

Jones paid 75%-80% of the value of the winning ticket to the convenience store owner, purchased approximately 7,600 tickets, and amassed $11,376,000.00 in total winnings. See  *Jones,* ¶ 13 a and d. of Doc. No. 16, filed 4/11/19.  However, the PSR attributed $6,331,791.00 to him and did not take the position that the amount of total winnings constituted relevant conduct. PSR ¶ 18[10].  Under the reduced amount, the PSR placed Jones at a total offense level of 19. *Id.*  The Court sentenced Jones to 2 months, 2 years supervised release, and $313,025.00 in restitution.  See *Jones,* Docket No. 29.  The net result was that the Court departed downward by 19 levels from the advisory guideline range based on the $6,300,000.00 even though it could have used the higher amount of $11,300,000.00 which would have placed defendant in a total offense level of 25.  Further, the Court reduced restitution by 2/3 from the original amount the government alleged he amassed in total winnings, and 1/2 from the revised (manipulated) amount of the $,6,331,791.00.   Both the higher amount of winnings or the lower one are higher than the amount attributed to Yousef in this case. We infer from the pleadings and PSR that the basis for largely ignoring the guidelines loss calculations was that Jones' tax loss exceeded his cumulative gains taking into account that he received approximately 10% of the total amount of a winning ticket (the same as this case).  It is also probable that Jones' health played a role in the sentence. Here, while Yousef has different health issues than Jones, his disease is incurable and degenerative if not

---

[10] The citation to Jones' PSR is referred to in Jones' Sentencing Memorandum.

properly treated.  Both Jones and Yousef are deserving of compassion and a lenient sentence of probation.[11]

**B.  The George Vasiliades Case**

Even as recently as last year, courts in this district have departed below the applicable Sentencing Guidelines range for tax offenses and imposed sentences of probation where tax losses exceeded $1,000,000. A recent example is *United States v. Vasiliades,* 18-CR-10306-ADB ("*Vasiliades")* where the tax loss was more than $1,500,000.00 but not greater than $3,500,000.00 putting the defendant in base offense level 22.

Vasiliades, the owner of a construction business, wrongly classified his employees as independent contractors and his corresponding tax returns excluded amounts paid to employees as expense reimbursements and amounts paid to employees classified as independent contractors. See *Vasiliades* ECF No. 133 at p. 8.   Vasiliades' scheme, like here, took place over many years.  On July 19, 2022, the Court sentenced him to time served (approximately 3 weeks) and 3 years supervised release.  See *Vasiliades*  ECF No. 138. There was no substantial assistance departure sought in the case and the Court did not articulate the basis for its sentence.  We can infer that, in part, the justification for the sentence was his wife's illness.  However, even if it was it instructs us that this Court parses out its sentences based on the individual characteristics of each defendant.  In this case, Yousef does not have a wife with a serious illness but *he* personally suffers from a debilitating and incurable medical condition. Therefore, disparate sentencing would be tragic.

IX.    **Statistics Support Variances and Departures for Tax Loss Sentences**

---

[11] The fact that Jones pled guilty before trial and the Jaafars did not, should not justify disparate sentences on the principle that the defendants should not be penalized for exercising their constitutional right to trial.

There are numerous other cases in this district where defendants were sentenced to probation or home confinement despite the guidelines for tax loss. [12]

Nationally, statistics published by the Sentencing Commission show a downward trend in sentencing for tax fraud offenders. For example, in 2021 the average sentence for tax fraud offenders was 14 months, a decrease from 17 months in 2017, the prior year statistics were published.  See Quick Facts. www.ussc.gov/research/quick-facts. Of the 61.7% of defendants convicted of tax fraud who received a variance, an overwhelming 98.7% of them received a downward variance with an average sentence reduction of 65%. *Id.* These percentages are exclusive of substantial assistance departures. *Id.* In 2021, over 35% of defendants sentenced for tax offenses were sentenced to probation or to probation and alternatives. 104 defendants received probation only while 46 received probation and home confinement. *See* U.S.S.C. Statistical Information Packet, Fiscal Year 2021, Table 4. In the First Circuit, 50% of defendants received probation or probation and alternatives. *Id*. at Table 5. In 2020, over 30% of defendants were sentenced to probation or to probation and alternatives. 72 defendants received probation only while 40 received probation and home confinement. *See* U.S.S.C. Statistical Information Packet, Fiscal Year 2020, Table 4. In the First Circuit, 25% of defendants received probation or probation and alternatives. *Id*. at Table 5. In 2019, over 35% of defendants were sentenced to probation or to probation and alternatives. 121 defendants received probation only while 71 received probation and home confinement. *See* U.S.S.C. Statistical Information Packet, Fiscal Year 2019, Table 4. In the First Circuit, over 56% of defendants received probation or probation and alternatives. *Id*. at Table 5.

## X.      Yousef's Criminal History Category Overstates the Seriousness of His Record

---

[12] In *United States v. Angiulo*, the tax loss was $1,769,486 and the defendant was sentenced to probation with a period of home confinement. No. 20-CR-10218-DPW at ECF No. 38. Similarly in *United States v. Markos*, the tax loss exceeded $2,000,000 and the defendant was sentenced to probation with home confinement. No. 15-CR-10387-PBS at ECF No. 163. In *United States v. Tutunjian*, the defendant was sentenced to probation and community confinement where tax loss exceeded $2,000,000. No. 16-CR-10225-DPW at ECF No. 36. In *United States v. McLaughlin*, defendant was sentenced to probation and the tax loss was $1,686,541. No. 20-CR-10310-DPW at ECF No. 25. In another recent case, *United States v. Enwright*, the tax loss was over $1,000,000 and the government recommended two years' incarceration, but the defendant was sentenced to probation with a period of home confinement. No. 21-CR-10038-GAO at ECF No. 22.

The PSR placed Yousef in criminal history category II based on two minor prior convictions, one a sealed juvenile adjudication and the other based on a guilty plea two days after Yousef's arrest in a New Jersey Superior Court case in which there were 82 defendants.

In *United States v. Merritt*, 755 F.3d 6 (1st Cir. 2014) ("*Merritt*") the First Circuit did not disturb a determination by the District Court that the defendant's criminal history category overstated the seriousness of his record in a conviction in which the defendant's youthfulness played an important role. *Merritt*, 755 F.3d 6, 12. The same result should happen here. Yousef was charged in July 2008 at the age of 15 in Juvenile Court in Waltham with obscene material. See ¶ 58 of the PSR. The PSR acknowledges that the case is sealed. *Id.* Because neither the Probation Department nor the defendant have access to those records, it is impossible to determine whether there was an adequate basis for the continuance without a finding disposition and whether the plea colloquy was conducted in accordance with the law. [13]

The PSR relies on only a Watertown Police Department incident report and not the court's records in its description of the alleged facts. *Id.* The report, however, is not a substitute for tested fact finding or for a determination of the sufficient facts on which Yousef entered a plea. It is not reliable. Discrepencies in the police report prove our point. For example, it does not match the date of the arrest/incident. The incident report refers to November 11, 2008 while the date of arrest was 4 months earlier, on July 11, 2008. *Id.* It is an inconsistency that is not addressed or reconciled in the PSR.

This case illustrates why sealed juvenile convictions are rarely scored. Given the dearth of information about the case, the lack of quality of a police report, the lack of a record of a finding of facts, and the lack of a record of the proceedings, it is too unreliable to attribute one criminal history point. Moreover, considering that the sparsely described offense conduct has never occurred again, we

---

[13] Yousef was not represented by counsel at these proceedings.

suggest that this Court attribute Yousef's youthfulness as an important factor and, in this Court's exercise of its "duty ... to make evaluative judgments" regarding a defendant's criminal history, *United States v. Merritt*, 755 F.3d 6, 12 (1st Cir. 2014) and find that Yousef's criminal history category overstates the seriousness of his record.[14] He should be in a CHC I.

### XI.     The Record Does Not Support an Enhancement for Obstruction of Justice

Section 3C1.1 provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and the obstructive conduct related to the offense of conviction or a closely related offense. U.S.S.G. § 3C1.1. Here, the enhancement for obstruction of justice is based on the trial testimony of Nicholas Frankel. His trial testimony is not credible in light of his prior statements and omissions, and the fact that Ahmed Shikhalard, a similar witness as Frankel, testified at trial that he was not asked by Yousef to obstruct the investigation or lie to anyone.

The government has not sought an obstruction charge or enhancement. Even if it did, it must prove obstruction by a preponderance of the evidence. See *U.S. v. Quirion*, 714 F.3rd 77, 79 (1st Cir. 2013). We call on the Court to make independent findings necessary to establish an obstruction enhancement. See *U.S. v. Dunnigan*, 507 U.S. 87,95 (1993).

The trial record establishes that Frankel, who has familiarity with the criminal justice system having been convicted of OUI, spoke to a Special Agent in the investigation on September 9, 2020 and then again on September 17, 2020 via an attorney proffer. The agents prepared Memoranda of those interviews. Neither memorandum attributes a statement by Frankel indicating that he was asked by

---

[14] The First Circuit will not disturb a below-guidelines sentence. See *United States v. King,* 741 F.3d 305, 310 (1st Cir. 2014) ("It is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness."). *United States v. Crocco*, 15 F.4th 20, 26 (1st Cir. 2021).

Yousef to obstruct the investigation.  Frankel's attorney, an experienced former AUSA, gave both attorney proffer to investigators and knew or should have known that inclusion of an alleged obstructive discussion between his client and Yousef would have been material and should have been disclosed. Frankel's attorney's silence on the subject is relevant.  Both proffers were made nearly contemporaneously with the alleged obstructive comment and would have been fresh in Frankel's memory.  The search warrant was executed on September 9, 2020 and Frankel, through his attorney, spoke to the government that same day. At trial, Frankel testified that the alleged conversation with Yousef took place several days later knowing that his statement was not disclosed in the agent's memorandum. Tr. p. 38, ll. 12-22.  When Frankel's attorney provided a second proffer on September 17, 2020 the alleged contact by Yousef had occurred less than two weeks beforehand.  The alleged statement Yousef made to Frankel should have been fresh in Frankel's memory.  The fact that Frankel's attorney did not disclose it at the time is noteworthy.  If Frankel did not disclose it to his attorney, it's more likely than not that the communication between Yousef and Frankel never took place.  We take this position because we seriously doubt Frankel discussed the communication with his attorney and the attorney failed to disclose it to the government.  Nonetheless, neither Frankel nor his attorney ever corrected or updated his proffer.

Yet, at trial, two years later, Frankel, who has a documented history of substance abuse, testified to a short 5-minute contact by Yousef in September 2020 and not again on any subsequent occasion. His trial testimony is self-serving and most likely an intent to bolster his testimony against Yousef to avoid staying out of prison.  His silence in the September 2020 proffers which were contemporaneous with the time of alleged communication are more likely the truth of the matter and by not disclosing them in his two pre-trial proffers is a strong indication they never occurred.

Moreover, his trial testimony is uncorroborated by testimonial or documentary evidence, there being no witness testimony, videos or audio recordings of Yousef's alleged conversation with Frankel in

September 2020.  The credibility of Frankel's testimony is further undermined by the fact that Ahmed

Shikhalard, a trial witness for the prosecution, was specifically asked a similar question at trial about

contact with Yousef post-search warrant:

> "What, if anything, did Yousef Jaafar tell you to say if you were
> questioned by the lottery? A. He actually never -- we never had that conversation."
>  See transcript of Day 3 at p. 18, ll. 1-3.

Shikhalard, like Frankel, testified that he cashed lottery tickets at Yousef's request.  As a matter of

logic, it would not have made sense for Yousef to direct only one of the two similarly situated witnesses

to lie to investigators instead of the two of them.  Such a scheme undoubtedly would have failed if only

one of the two witnesses was asked to obstruct the investigation.  Frankel's testimony on the subject, for

the reasons set forth herein, lacks credibility and a two-point enhancement for obstruction of justice is

not warranted.

## XII.    Suspend Restitution Payments and Other Financial Obligations If Incarcerated

If Yousef is sentenced to a period of incarceration, he requests that this Court order than any

restitution, fines, or other like-kind penalties be suspended while he is incarcerated until he is placed on

supervisory release.  The Inmate Financial Responsibility Program (IFRP), operated by the BOP, is the

mechanism through which the BOP has authority to force an inmate to pay while incarcerated.  See 28

CFR §545.10.  Even though the IFRP is "voluntary" there are significant consequences if an inmate does

not participate in the program and make a plan to repay its financial obligations while incarcerated,

including placement of the inmate in an FRP Refuse Status.  The penalty may result in designation into a

higher security classification, exclusion from participation in community-based programs, and the like.

Because restitution in this case is likely to be in the six-figures, it will be impossible for Yousef to make

payments under the IFRP and suffering the draconian consequences should be factored into this Court's

sentencing.  At a minimum, this Court should suspend any restitution and fines until Yousef is on

supervised release.  The alternative is that Yousef be placed in home confinement to make restitution payments.

## CONCLUSION

We urge the Court to impose any combination of punishments other than a prison sentence based on the totality of circumstances.  Such a sentence can include a combination of home or community confinement followed by a three year period of supervised release.

Respectfully submitted,

YOUSEF JAAFAR
By his attorneys,

*/s/ Valerie S. Carter*
Valerie S. Carter, BBO # 545412
Carter & Doyle LLP
789 Washington Street, Suite 2
Canton, MA 02021
(781) 235.4400
(781) 235.4401 (fax)
DATED: May 16, 2023                    vcarter@carterdoyle.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Valerie S. Carter*
/s/ Valerie S. Carte